UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADRIANN BORUM, *et al.*,

        *Plaintiffs*,

v.

BRENTWOOD VILLAGE, LLC, *et al.*,

        *Defendants*.

Civil Action No.  16-cv-1723-RC

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Defendants Brentwood Associates Limited Partnership, Mid-City Financial Corporation ("Mid-City"), and Edgewood Management Corporation, by and through their undersigned counsel, hereby file their reply to Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss.  For the reasons stated in Defendants' motion, their memorandum in support thereof, and this reply, the motion to dismiss should be granted.

### INTRODUCTION

Plaintiffs' Opposition ("Pls' Opp.") is somewhat remarkable in that Plaintiffs spend much of it distancing themselves from statements made in their Complaint and attempting to recast the basis of their claims and the nature of the relief sought.  Those tactics cannot spare Plaintiffs' Complaint from dismissal.

I.   PLAINTIFFS HAVE FAILED TO ADEQUATELY REBUT THE FACT THAT THE COMPLAINT IS BASED ON A NON-RECOGNIZABLE PROTECTED CLASS OF LARGE FAMILIES AND THAT THEIR DISPARATE IMPACT CLAIMS ARE ERRONEOUSLY FOCUSED ON ONE ASPECT OF THE DEVELOPMENT PLAN RATHER THAN ON THE PLAN AS A WHOLE

Plaintiffs argue long and hard that they are <u>not</u> alleging that the proposed development plan (actually only one aspect of the plan) has a disparate impact on merely "large families," but instead on all families.[1]  Yet, that assertion is completely undermined in Plaintiffs' allegations in the very beginning of the Complaint, which state as follows:

> The owners and operators of Brookland Manor Apartments ("Brookland Manor") have deemed **large families** "not consistent with the creation of a vibrant new community."  **These families** will be forcibly displaced from Brookland Manor because many three-bedroom and all four- and five-bedroom apartments that can accommodate **them** will be eliminated.  As a result, **larger families** will be forced to find housing elsewhere in the District of Columbia or surrounding states, most likely in neighborhoods that lack the diversity of Brookland Manor and the surrounding areas, or will be rendered homeless.  This redevelopment plan violates federal and District of Columbia fair housing laws that protect tenants from discrimination based on their "familial status."

Compl. at p. 2 (emphasis added).  Accordingly, throughout the Complaint, Plaintiffs focus on alleged statements Defendants made about "large families."[2]  Moreover, the class of potential claimants whom the named Plaintiffs seek to represent is not a class of all tenants throughout Brookland Manor meeting the definition of familial status, but rather, only "all households who reside or have resided at Brookland Manor in a three-, four, or five bedroom unit[.]"  Compl. at para. 22.  There is no question that the gravamen of Plaintiffs' Complaint is an alleged disparate impact of the elimination of certain apartments on "large families."

---

[1]    *See, e.g.*, Pls' Opp. at p. 1 ("Plaintiffs do not, as Defendants wrongly contend, allege a disparate impact on merely "large families," but instead allege that the proposed development plan has a disparate impact on families as a whole.").

[2]    *See, e.g.*, Comp. at paras. 8, 9, 60, 61, 64, 65, 66, 68, 129, 165, 166, 173, 174.

It is understandable why Plaintiffs try mightily to now cast their Complaint as one alleging disparate impact on all families, not just large families.  They realize that a focus on such a subset of a protected class is fatal under precedent of this judicial circuit.  Defendants urge this Court to reject Plaintiffs' ruse.

II.  To State A Cause of Action of Disparate Impact Based on Familial Status Discrimination, the Claim Must Be Founded On the Impact of the Entire Redevelopment Plan On the Entire Protected Class, Not A Subset Thereof.  The Complaint Fails To Do That and Should Be Dismissed As A Matter of Law.

A.  This Circuit Has Rejected Disparate Impact Claims Which Focus On a Subset of a Protected Class Rather Than the Class As a Whole.

In their Memorandum of Points and Authorities In Support of their Motion to Dismiss the Class Action Complaint (hereinafter, "Defendants' Dismissal Brief" or "Dismissal Br.") at pp. 12-18, Defendants discussed at length that Plaintiffs' disparate impact discrimination claims are deficient as a matter of law because, *inter alia*, they are based on examination of the impact of <u>a portion</u> of the redevelopment plan not on all the members of the protected class of families who satisfy the criteria for familial status[3] under the Fair Housing Act ("FHA") and the District of Columbia Human Rights Act ("DCHRA"), but rather only a subset thereof – namely, only "large families" which Plaintiffs alternatively describe as families occupying three-bedroom, four-bedroom or five-bedroom apartments.  Defendants supported this argument by bringing to this Court's attention this judicial circuit's precedent of *Greater New Orleans Fair Housing Action Center v. U.S. Dept. of HUD*, 395 U.S. App. D.C. 67, 639 F.3d 1078, 1086 (D.C. Cir. 2011) ("*GNOFHAC*") and *Boykin v. Gray*, 986 F. Supp. 2d 14, 20 (D.D.C. 2013), both of which stand for the proposition, among other things, that in

---

[3]    Under the FHA and the DCHRA, familial status does not apply to all families, but only those which include at least one minor child together with a parent or other person having legal custody of such child, or the designee (in writing) of such parent or other person.  *See, e.g.*, 42 U.S.C. § 3602(K).

disparate impact cases, the court must examine the impact of the policy or program at issue upon the underlined entire protected class to which the program was supplied.  Thus, in *Boykin* which challenged a District of Columbia program concerning housing for the homeless, the protected group upon whom the impact of the policy was to be assessed was the city's entire homeless population to whom the policy was applied, not just a subset thereof, namely only the residents of one specific homeless shelter.

Similarly, in *GNOFHAC*, which involved a grant formula applied to Louisiana homeowners affected by hurricanes, the United States Court of Appeals for the District of Columbia Circuit instructed that the impact of the grant program formula had to be assessed against all African-Americans in all parts of Louisiana to which the program applied, not merely "a special subset" thereof.  *See*, 639 F.3d at 1086.

Defendants also pointed out that the District of Columbia Circuit is not alone in this approach.  *See*, *e.g.*, *Fair Housing Advocates Ass'n, Inc. v. City of Richmond Heights, Ohio*, 209 F.3d 626, 638 (6th Cir. 2000) ("families of four, as opposed to families of three, are not a protected class"); *Easthampton Center LLC v. Township of Easthampton*, 155 F. Supp. 2d 102, 116 n.15 (D. N.J. 2011) (The express language of the FHA expanding coverage on the basis of familial status applies to all families, not just a subset thereof.).

Another such case illustrating this principle is *Debolt v. Espy*, 832 F. Supp. 209 (S.D. Ohio 1993), wherein a public housing resident brought a class action on her behalf and those persons similarly situated challenging an agency's administration of a public housing program. The named plaintiff, who was a tenant in a two-bedroom apartment,[4] alleged that the program's occupancy limits and the absence in her housing development of three-bedroom and four-

---

[4]     During her tenancy, the named plaintiff twice gave birth to children, thereby increasing her family to a size which exceeded the program's occupancy limits for two-bedroom apartments.

bedroom apartments produced a disparate impact against large families – *i.e.*, those families in

need of three-bedroom and four-bedroom apartments.  In granting summary judgment on

behalf of the defendant agencies, the court stated as follows:

> In 1988, Congress passed the Fair Housing Amendments Act of 1988 which amended the Fair Housing Act of 1968, which is located in 42 U.S.C. §§ 3601-3631.  The Fair Housing Act is also referred to as Title VIII of the Civil Rights Act of 1968.  Pursuant to Title VIII, discriminatory housing practices based on race, color, national origin, religion, and sex are prohibited.  The 1988 Amendments added "familial status" as a protected category with respect to discriminatory housing practices.  <u>The Court notes that as opposed to families in general, "large families" are not a specifically protected class under Title VIII.</u>

832 F. Supp. at 215 (emphasis added).  All of these cases taken together demonstrate that it is

well-established that failure of a claim, such as Plaintiffs', to base a disparate impact claim on

impact suffered by the entirety of the protected class rather than a subset thereof is fatal.  The

only case cite in an attempt to argue otherwise, namely *Betsey v. Turtle Creek Assoc.*, 736 F.2d

983 (4th Cir. 1984), is clearly inapplicable as is discussed *infra*.

> B.  <u>Plaintiffs' Disparate Impact Claims Are Also Deficient Because They Focus Only On One Aspect of the Development Plan, Rather Than the Development Plan As A Whole</u>

Also fatal to Plaintiffs' claims is their reliance on only a portion of, rather than

the entire, development plan.  In their motion to dismiss, Defendants, again citing *GNOFHAC*

and *Boykin*, conclusively demonstrated that a disparate impact claim must be based on the

impact that the <u>entire</u> program or plan had on an <u>entire</u> protected class of individuals, not the

impact that only a portion of the plan would have on a subset of a protected class.  See

Dismissal Br. at pp. 11-18.  To do otherwise would be to invite "analytical cherry picking."

See *Boykin v. Gray*, *supra* at 20.

Faced with such imposing precedent, Plaintiffs avoid arguing that *GNOFHAC* and *Boykin* do not stand for the principles that disparate impact claims must focus on the impact of the entire program at issue upon the entire protected class.  Rather, Plaintiffs argue that those cases simply should not apply and that this Court should instead give preference to a decision from an outside jurisdiction, which, frankly, is clearly distinguishable from the instant case.

As Defendants noted in their Dismissal Brief, in *Boykin*, a group of African American and Hispanic residents of one of the District of Columbia's homeless shelters were unsuccessful in advancing a disparate impact claim due to the fact that the overall plan of the city, which included closure of the La Casa shelter, actually resulted in an overall increase of housing for the homeless.  Plaintiffs' argue that *Boykin* is inapplicable because:  "Contrary to the facts of *Boykin*, the loss of Brookland Manor's three-, four- and five-bedroom units is not a part of a program intended to yield a net increase in the availability of affordable housing for families."  Pls' Opp. at 6.  Plaintiffs' challenge to *Boykin* is deficient in multiple respects.

First, Plaintiffs once again attempt to extrapolate a position based on one aspect of the redevelopment plan ("the loss of Brookland Manor three-, four- and five bedroom units") rather than the entire plan.  Moreover, based on the allegations of Plaintiffs' own Complaint, the impact of the overall development plan will be to greatly increase the total number of apartments from 535 to 1646 (Compl. at paras. 30, 48) and, in doing so, to <u>increase</u>, not decrease, housing opportunities for families.  In this regard, as Defendants noted in their Dismissal Brief,[5] and which Plaintiffs did not dispute in their Opposition, if one applies the family occupancy rates Plaintiffs allege in the Complaint (para. 75) to the new apartments to be built, the housing opportunities for families in the new development more than double.  Thus,

---

[5]   See Dismissal Br. at p. 18, n.6.

as exactly was the case in *Boykin*, the overall impact of the entire plan at issue is to increase

housing for the protected class (not just large families, but rather all families satisfying the

definition of familial status).

Plaintiffs also argue that *Boykin* is distinguishable because the case there was dismissed

on summary judgment, not on a motion to dismiss.  Pls' Opp. at p. 6.  What Plaintiffs fail to

comprehend, however, is that unlike in *Boykin*, all the facts fatal to Plaintiffs' claims, *i.e.*, that

the overall impact of Mid-City's entire development plan is to increase housing opportunities

for families qualifying for familial status, are found within the Complaint itself, thereby paving

the way for dismissal of the Complaint at this stage of the proceedings.

Plaintiffs' attempts to distinguish *GNOFHAC* are equally unavailing.  Once again,

Plaintiffs ask this Court to refrain from applying the holding in *GNOFHAC* to them because the

United States Court of Appeals for the District of Columbia Circuit made its holding in review

of the trial court's grant of a preliminary injunction.  See Pls' Opp. at p. 7 ("Just as with

*Boykin*, Defendants' reliance on *GNOFHAC* is misplaced because the procedural posture was

not on a motion to dismiss and instead involved a preliminary injunction, which required the

plaintiffs to show a substantial likelihood of success on the merits.") (citation and footnote

omitted).  However, as previously explained, the vitality of Plaintiffs' claim is doomed by their

own allegations as contained in the Complaint.[6]

Plaintiffs also attempt to distinguish *GNOFHAC* because they have, allegedly,

"properly relied on proportional statistics by demonstrating how Defendants' policy of

eliminating and reducing 3, 4, and 5 BR units will adversely affect a larger portion of all

families at Brookland Manor as compared to non-families at the same property."  Pls' Opp. at p.

---

[6]    Their claims are also doomed by matters in the public record, of which this Court may take
judicial notice on a motion to dismiss.

7.  Rather than being a source of support, this statement highlights the deficiencies of Plaintiffs' claims because Plaintiffs limit their focus to only a portion of the redevelopment plan, *i.e.*, "Defendants' policy of eliminating and reducing 3, 4, and 5 BR units[,]" not Defendants' entire redevelopment plan that will more than triple the number of apartments and more than double the housing opportunities for families.  Furthermore, the allegations of their Complaint make clear that they have not "properly relied on proportional statistics" because their expert, whose opinion they cite in the Complaint, did not perform a statistical analysis of the impact of the entire development plan on the entire protected class, *i.e.*, families qualifying for familial status protection under the FHA and the DCHRA, and in this regard failed to examine the impact on families who are occupying or will occupy one-bedroom and two-bedroom apartments.

Finally, Plaintiffs attempt to persuade this Court to ignore the holdings of *GNOFHAC* and *Boykin* and to instead adopt what they assert is the holding from a case outside of this judicial district, namely, *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983 (4th Cir. 1984).  In *Betsey*, a company purchased an apartment complex containing three buildings.  One of the buildings was occupied by mostly African-American families and the owner decided to remove from that building families with children, and thereby create an "all-adult" community.  There was only one building (Building Three) impacted by this policy – it was not part of an overall plan to build apartment buildings and relocate tenants.  The trial court dismissed the disparate impact claim because there was no evidence that the conversion of the building in question would have a greater impact on African-Americans in the local community, that it would perpetuate segregation in the apartment complex, or that it would have a continuing disproportionate impact on African-Americans.  *See*, 736 F.2d at 986-87.

8

The Fourth Circuit reversed the decision of the trial judge and remanded the case for further proceedings to determine whether there was a legitimate non-discriminatory reason or business necessity compelling the eviction policy.  In doing so, the Fourth Circuit determined that the minority residents were not required to demonstrate any discriminatory impact on anyone outside of Building Three and that it was irrelevant what impact was or was not suffered by other tenants in the development that were not the subject of the conversion plan. ("The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied.").  *Id.* at 987 (footnote omitted).

The holding in *Betsey* is not at odds with the holdings in *GNOFHAC* or *Boykin* in the respect that the entire plan (in *Betsey* the conversion plan applied to one building, and here the entire redevelopment plan applied to all buildings) must be examined, as must the impact on the entire protected class affected (families qualifying for familial status protection, not just large families so qualifying).  To the extent *Betsey* is at odds (such as regarding whether or not the new housing opportunities created by Mid-City's redevelopment plan may be taken into account) with *GNOFHAC* and *Boykin*, it simply is not controlling.  In this regard, the D.C. Circuit was well aware of *Betsey* when deciding *GNOFHAC* and indeed cited it for the proposition that in disparate impact cases, the correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied (639 F.3d at 1087), yet the D.C. Circuit proceeded to reject a challenge to a grant formula that focused on the impact of one aspect of the grant program on one discrete subset of the protected class, rather than the impact of the entire program on the class as a whole.  In *GNOFHAC*, the fact that one parish of Louisiana fared worse than other parishes did not create a disparate impact claim when the entirety of the grant program was taken into consideration.

Moreover, in *Betsey*, eviction notices only went to families with children in Building Three.  In the instant case, each and every tenant, whether that tenant is an individual, a family without minor children or a family with minor children will eventually be relocated because all of the nineteen (19) buildings comprising Brookland Manor will be demolished and replaced by new housing over the next decade.  Thus, all tenants are impacted by the redevelopment plan regardless of familial status.  Such circumstances do not support a disparate impact claim.[7]

When the holdings of this judicial district, namely, *GNOFHAC* and *Boykin* are correctly applied to the instant case, there is no doubt that Plaintiffs' discrimination claims must be dismissed as a matter of law for failing to state a claim.

III.    PLAINTIFFS' COMPLAINT CONTINUES TO SEEK RELIEF NOT RECOVERABLE AS A MATTER OF LAW

Defendants' Dismissal Brief set forth that Plaintiffs' claims for equitable relief should be dismissed as violative of Mid-City's constitutional right to access to administrative agencies, namely the District of Columbia Zoning Commission for filing and prosecution of the Stage 2 PUD application, and making statements in support thereof.  In this regard, Defendants pointed out that the Complaint requests, *inter alia*, that this Court "enjoin[ ] Defendants'

---

[7]    *See also*, .*e.g.*, *English Woods Civic Assoc. v. Cincinnati Met. Housing Auth.*, 2004 U.S. Dist. LEXIS 26389 (S.D. Ohio 2004), wherein a tenants association sought to enjoin a local housing authority from demolishing a housing development as part of an "occupancy consolidation" plan and implementing a plan that would distribute the occupants to neighborhoods throughout the local community.  Approximately 95% of the housing development were African-American and the plaintiff alleged that the housing plan had a disparate impact on minorities.  In entering judgment against the plaintiff, the court stated as follows:

> Here, the Plaintiff did not evidence that CMHA's conduct causes non-members of the class (whites) to be treated differently than members of the class (blacks).  All English Woods residents, black and white, have been treated equally.  The mere fact that CMHA's conduct impacts more blacks than whites (because blacks outnumber whites at English Woods) does not give rise to a showing of disparate impact, unless the whites are treated differently than the blacks.  A finding otherwise would result in "the illogical assertion at best" that all actions of CMHA would result in disparate impact liability.

*Id.* at p. 9 (citations omitted).

implementation of the currently proposed redevelopment unless and until the redevelopment

ensures that housing will remain available for members of the Proposed Class who reside in

current three-, four-, and five-bedroom units." Dismissal Br. at p. 29.  The Complaint also

asked for preliminary injunctive relief and Defendants pointed out how Plaintiffs have further

defined that latter relief to include preventing Mid-City from filing and prosecuting and

receiving Zoning Commission approval of a Stage 2 PUD application.  *Id.*  With respect to the

preliminary injunctive relief, Plaintiffs recently have expanded their requested relief to include

enjoining Defendants "from taking any action to relocate on or off Brookland Manor property,

displace, transfer, 'right-size,' down-size, evict, or otherwise bring about the cessation of

tenancy of any current Brookland Manor leaseholder for any reason related to the planned

redevelopment of the Brookland Manor property.  Any effort to consolidate vacancies in

certain buildings, incentivize attrition off the property, or otherwise effectuate non-voluntary

relocation on or off the property, including through refusal without good cause to (1) renew a

resident's lease or (2) address a valid housing conditions issue shall be considered 'related to

the planned redevelopment.'"  See Plaintiffs' [Proposed] Order Granting Plaintiffs' Motion for

Preliminary Injunction (9/29/16).[8]

Plaintiffs' response to this argument largely places form over substance.  For example,

Plaintiffs argue that Defendants are conflating preliminary relief with permanent relief and that

in any event, this Court may not dismiss the relief requested, only claims made, and that a Rule

12(b) motion is an improper vehicle for attacking relief requested.  Pls' Opp. at pp. 19-22.

Courts have differed on whether a motion attacking relief requested is more appropriately the

---

[8]    Plaintiffs' expanded request for preliminary injunctive relief carries additional infirmities as
well such as the abrogation of Mid-City's freedom of contract.  *See*, *e.g.*, *Goodman v. District of
Columbia Rental Housing Comm'n*, 573 A.2d 1293, 1297 (D.C. 1990); *Double H Housing Corp. v.
David*, 947 A.2d 38, 42 (D.C. 2008).

subject of a motion to dismiss or a motion to strike.  Compare *Professional Asset Management, Inc. v. Penn Square Bank*, 566 F. Supp. 134, 136 (D. Okl. 1983) (Application to eliminate plaintiff's claim for punitive damages was improperly styled as a motion to strike rather than a motion to dismiss.) with *Simba v. Fenty*, 754 F. Supp. 2d 19, 23 (D.D.C. 2010) (Motion to strike, not motion to dismiss, is appropriate means of challenging remedy.).  What is not in dispute, however, is that the technical name given to a motion challenging a pleading is of little importance, inasmuch as prejudice to the non-moving party as a result of a misnomer is remote. *See*, *e.g.*, *Balabanos v. North Am. Inv. Group, Ltd.*, 708 F. Supp. 1488 (D.C. Ill. 1988). Accordingly, judges of this very Court have treated the portion of a motion to dismiss, which challenges the legal sufficiency of relief requested in a complaint, as a motion to strike.  *See*, *e.g.*, *United States v. Retta*, 840 F. Supp. 2d 262, 268 (D.D.C. 2012) (That portion of a multifaceted motion to dismiss which challenged the plaintiff's entitlement to liquidated damages, would be treated by the court as a motion to strike the relief.).  This Court certainly has the authority to eliminate claims for relief which are not recoverable as a matter of law. *See*, *e.g.*, *Fox v. Lummus Co.*, 524 F. Supp. 27, 30 (S.D.N.Y. 1981) (Relief sought which was not recoverable as a matter of law, was subject to being stricken.).

Defendants discussed at length that the injunctive relief Plaintiffs' request is not available as a matter of law, and they will not repeat those arguments here, but instead respectfully refer this Court to the Dismissal Brief at pp. 29-31.[9]  It should be noted, however,

---

[9]    Perhaps recognizing the Constitutional infirmities of their injunctive relief request, Plaintiffs argue the issue is moot because Mid-City proceeded to file the Stage 2 PUD application once the period for which Mid-City agreed to forebear expired.  In so arguing, Plaintiffs attempt to characterize the issue as limited to interference with Mid-City's right to file a Stage 2 application with the Zoning Commission.  The filing of that Stage 2 application, however, does not eliminate the threat Plaintiffs' request for injunctive relief poses on Mid-City's right to access to the Zoning Commission, because the relief sought by Plaintiffs, such as "enjoining Defendants' implementation of the currently proposed redevelopment unless and until the redevelopment ensures that housing will remain available for

4842-5364-2042.v1

that is not the only example of relief requested by Plaintiffs that this Court, as a matter of law, may not grant.

Specifically, as part of their prayers for relief, Plaintiffs ask that this Court "declare that Defendants are obligated as a matter of law, to make housing available to families requiring three-, four-, and five-bedroom units as part of its planned redevelopment."  Compl. at p. 35. Plaintiffs, in essence, ask this Court to compel Mid-City to build apartments for them at their preferred configurations as part of the PUD plan.

Defendants have already brought to this Court's attention case law addressing the inappropriateness of such requests.  *See, e.g.*, *Texas Dept. of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522-23 (2015) ("The FHA does not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low income housing in suburban communities."). More to the point, however, is the case of *Debolt v. Espy*, *supra*, wherein an occupant of public housing brought a class action complaint contending that Farmers Home Administration's ("FmHA") occupancy limits combined with its administration of a housing program produced a discriminatory impact on families with children because the housing project lacked three-bedroom and four-bedroom apartments sufficient to accommodate plaintiff's ever-growing family and the families of other similarly situated class members.  In granting summary judgment against the plaintiffs, the court noted its agreement with the defendant agency that neither the United States Housing Act of 1949, nor the Fair Housing Act commands the agency

members of the Proposed Class who reside in current three-, four-, and five-bedroom units," will potentially bar Mid-City from further prosecuting the Stage 2 PUD application which is founded on a Stage 1 Zoning Commission Order approving the redevelopment plan without the inclusion of the larger apartments.

to finance construction of additional three and four-bedroom units "or to dictate to private developers that they must build such units."  832 F. Supp. at 214.  The court went on to state as follows:

> The Court finds that the Plaintiffs' position here is not supported by the Fair Housing Act, the legislative history of the Act, the administrative interpretation of the Act by the Secretary of HUD, and the relevant case law.  Indeed, the Plaintiffs simply have no right to public housing, and the FmHA is not obligated to finance or to compel private developers to build large apartment units.

*Id.* at 215 (emphasis added).

Accordingly, regardless of whether the relief under Rule 12 be couched as a dismissal or as striking, Plaintiffs' equitable claims for relief should be eliminated.

IV.   PROCEEDINGS OF THE ZONING COMMISSION ARE JUDICIAL IN NATURE AND THE COMMISSION DOES HAVE THE JURISDICTION TO, AND INDEED MUST, CONSIDER CHALLENGES TO A PUD BASED ON DISCRIMINATION

Scattered throughout Plaintiffs' Opposition concerning the jurisdictional, exhaustion, abstention, and preclusion grounds of the motion to dismiss, is Plaintiffs' argument that the proceedings of the Zoning Commission (the "Commission") are not "judicial in nature" and that the Commission has neither the competence nor authority to rule on discrimination claims.[10]  Plaintiffs further argue that the Commission could not have provided injunctive relief to Plaintiffs.  *See, e.g.*, Pls' Opp. at pp. 12, 19.  Plaintiffs base these arguments on an inaccurate interpretation of District of Columbia law, as well as a failure to comprehend the decisions of the District of Columbia Court of Appeals addressing the authority of the Commission.

---

[10]   *See, e.g.*, Pls' Opp. at pp. 8 ("the Zoning Commission has neither the judicial competence nor the authority to rule upon and provide remedies for these claims"); p. 9 ("the Zoning Commission is not competent to adjudicate Plaintiffs' civil rights claims"); p. 11 ("the Zoning Commission is not a competent body to decide discrimination claims"); p. 14, n.8 ("the Zoning Commission is not a competent body to decide discrimination claims"); p. 19 ("the Zoning Commission is not a competent body to adjudicate Plaintiffs' civil rights claims").

With respect to the statutory basis of the Commission's authority, Plaintiffs contend that D.C. Code § 6-641.01 limits the Commission's authority to regulating the location, height, bulk, number and stories and size of buildings, among other things.  Pls' Opp. at 11-12. Plaintiffs misconstrue the Commission's authority.  First, the statutory section Plaintiffs cite addresses the Commission's authority regarding regulations, not its authority *in toto*.  The Commission's general powers are described in D.C. Code § 6-621.01, which include the power "to protect the public health, secure the public safety and to protect property" and to "exercise all the powers and perform all the duties with respect to zoning in the District as provided by law."  § 6-621.01(a)(e).  Among the obligations of the Commission is the obligation to make sure that proposed projects are consistent with the District of Columbia Comprehensive Plan as a whole.  *Durant v. D.C. Zoning Com.*, 65 A.3d 1161, 1167 (D.C. 2013) (The Zoning Commission may not use the PUD process to approve a project inconsistent with the Comprehensive Plan or with any other adopted public policies and active programs related to the subject site.).  The Comprehensive Plan is a broad framework intended to guide the future land use planning decisions for the District and it guides the executive and legislative decisions on matters affecting the District and its citizens.  65 A.3d at 1162, n.1.  One aspect of the Comprehensive Plan identifies the District's commitment to fair housing, including the prohibition against housing discrimination based on family status.  11 DCMR 513.1. Accordingly, the Commission had the authority, indeed the duty, to reject any PUD that would cause housing discrimination.  *See also*, *e.g.*, *Community Housing Trust v. Dept. of Consumer and Reg. Affairs*, 257 F. Supp. 2d 208, 223 n.18 (D.D.C. 2003) (Noting that the Zoning Commission may find that regulations governing community-based residential facilities are violative of the FHA); *George Washington Univ. v. D.C. Bd. of Zoning Adjustment*, 831 A.2d

921, 940-41 (D.C. 2003) ("[T]he BZA is subject to the interdictions of the Human Rights Act, and that the Act may be invoked against any application of the zoning regulations which discriminates, in purpose or effect, on grounds prohibited by the Act") (footnote omitted); *United States v. District of Columbia*, 538 F. Supp. 2d 211, 218 (D.D.C. 2008) (The Board of Zoning Adjustment had the authority and responsibility to consider and apply the laws concerning reasonable accommodations based on a handicap).

The ability and authority of zoning agencies to consider and act in recognition of FHA concerns is a natural corollary. After all, "[a] local government or governmental entity using zoning powers in a discriminatory manner violates FHAA." *Community Housing Trust*, *supra*, 257 F. Supp. 2d at 221 (citations omitted). To say that the Commission is without authority to consider FHA challenges to a PUD would leave it powerless to avoid the discriminatory effects of a proposed plan. Accordingly, Plaintiffs' argument that the Commission lacks authority should be rejected. *See*, *e.g.*, *George Washington Univ.*, *supra*, 831 A.2d at 947 ("It is difficult to believe . . . that the drafters of this [sic] provisions [of the DCHRA] intended to countenance any governmental action which would prevent or impeded residence in an area of members of a protected class.").[11]

Moreover, the District of Columbia Court of Appeals has long held that Commission proceedings on PUDs are indeed contested cases to which the Administrative Procedures Act applies. Specifically, in the case of *Capitol Hill Restoration Society v. Zoning Com'n*, 278

---

[11]   Furthermore, Plaintiffs' argument that the Zoning Commission would have been incapable of providing complete relief because it cannot issue injunctions, is a red herring. Had the Zoning Commission been convinced that a PUD would produce discriminatory results, it simply could have withheld approval until any such discriminatory aspects were removed and in that manner provide comprehensive relief to the injured party.

4842-5364-2042.v1

A.2d 101 (D.C. 1972), the District of Columbia Court of Appeals addressed the nature of

Commission proceedings, and concluded as follows:

> [W]e find that the proceeding before the Commission was
> primarily concerned with the immediate "legal rights, duties, or
> privileges of specific parties," rather than with general policy of
> future applicability. A review of Article 75 of the Zoning
> Regulations reveals that before the Commission can approve a
> preliminary application for a Planned Unit Development
> (hereinafter PUD), it must resolve disputed fact questions of
> specific applicability . . . . Therefore, we hold that a proceeding
> involving an application for approval of a PUD is a *contested*
> case within the meaning of the APA, and that the procedures
> provided in D.C. Code 1967, § 1-1509 (Supp. IV, 1971), must be
> complied with.
>
> \* \* \* \*
>
> The Commission also argues that we should adopt the distinction
> advocated by Professor Davis between "trial" and "argument"
> type hearings. Specifically, we are asked to construe the phrase
> "after a hearing" in the definition of "contested case" to mean
> after a "trial type" hearing. We need not reach that question in
> this case. Even under Professor Davis' rationale, the case at bar
> clearly involves disputed questions of "adjudicative" rather than
> "legislative" facts. The facts in dispute here bear on particular
> parties and a particular situation rather than on general policy.
> Some adjudicatory facts present here are[.]

278 A.2d at 105-06 (footnotes and citations omitted).

Based on all of the foregoing, it is clear that the Commission had the authority to

consider FHA and DCHRA challenges to Mid-City's PUD application and that the proceedings

of the Commission are judicial in nature with respect to application of preclusion, abstention,

and exhaustion principles.

V. PLAINTIFFS' ARGUMENT AGAINST CLAIM PRECLUSION IS UNAVAILING

As previously mentioned, Plaintiffs' argument against preclusion is founded upon their

inaccurate construction of the authority of the Commission. It is also based on case law which

simply is inapplicable to the facts of this case.

For example, *The Barnes Foundation v. Township of Lower Merion*, 927 F. Supp. 874 (E.D. Pa. 1996), the Pennsylvania case cited by Plaintiffs for the proposition that a local zoning proceeding is an insufficient forum to raise civil rights claims, was a reflection of the limitations of the authority of that local governmental entity, which limitations as fully discussed herein, are not shared by the D.C. Zoning Commission.  The District of Columbia Court of Appeals has applied the claim preclusion doctrine to zoning decisions.  *Rhema Christian Center v. District of Columbia Bd. of Zoning Adjustment*, 515 A.2d 189, 194 (D.C. 1986).  Defendants renew their request that this Court apply claim preclusion to Plaintiffs' challenges to the Commission Order which considered and rejected an objection to Mid-City's proposed elimination of four-bedroom and five-bedroom apartments and the slight reduction in the number of three-bedroom apartments.

VI.     PLAINTIFFS' ATTACK ON APPLICATION OF THE ROOKER-FELDMAN ABSTENTION DOCTRINE IS UNAVAILING

Plaintiffs and Defendants obviously read the *Reiner v. State of California Dept. of Industrial Relations*, 2012 U.S. Dist. LEXIS 186080 (C.D. Cal. 2012) *aff'd*, 612 Fed. Appx. 473 (9th Cir. 2015), decision differently and, accordingly, Defendants will not here reargue its position on *Reiner* and why it finds the District Court's reasoning, and its construction on *Exxon Mobil*, compelling.

Defendants do, however, take strong issue with Plaintiffs' continuing effort to insist that its suit is merely an attack on Mid-City's development plan rather than what, in reality, it truly is, *i.e.*, an attack on the Stage I Order itself approving Mid-City's development plan. Assuming, *arguendo*, that, per *Reiner*, that Order is tantamount to a final state-court judgment, Plaintiffs are quite clearly attempting to do indirectly what Rooker-Feldman prohibits them from doing directly, *i.e.*, asking this court to perform the same function the District of

18

Columbia Court of Appeals would have performed, had the Stage I Order been appealed and the purported Fair Housing Act violation approved therein raised as an issue upon appeal. Indeed, Plaintiffs concede that through the instant case, "<u>Plaintiffs are challenging an application before the Zoning Commission[.]</u>" Pls' Opp. at 16.

The Stage I application Plaintiffs are now collaterally challenging was approved, thereby being merged with and incorporated into the Order.[12] That Order is final. Plaintiffs are thus trying to convince this Court to, in a sense, "supersede" that Order by forcing Mid-City to perform a "do over," *i.e.*, resubmit a set of plans that includes additional three-bedroom units, four-bedroom and five-bedroom apartments, thereby causing the Commission to have to re-visit its original decision. Plaintiffs know full well that, if this Court were to grant the relief they are seeking, the Commission would have to review and approve any revised development plan.

Presumably, if a court rather than the Commission was charged with reviewing and adjudicating PUD applications and that court approved Mid-City's Stage I application, Plaintiffs could not seriously argue that it would be permissible to launch a post-judgment attack on what the court had approved, after the time for noting an appeal therefrom had expired. Yet that is precisely what Plaintiffs are doing here, vis-a-vis the Stage I Order, which under District of Columbia law, is to be accorded the same sanctity as a final court order. See *Augur v. D.C. Board of Appeals and Review*, 477 A.2d 196 (D.C. 1984).

VII.   ORGANIZATIONAL STANDING

Plaintiffs' argument on the issue of ONE DC's organizational standing sets up a "strawman," but it is then knocked down by the very same excerpts from Plaintiffs' Complaint

---

[12]   Defendants noted in the Dismissal Br. that the PUD was not approved as submitted, but that the Commission required some revisions as a condition of approval.

which Defendants quoted in their Dismissal Brief.  See pp. 31-35.  Plaintiffs mischaracterize

Defendants' argument as being the same as was rejected in *Equal Rights Center v. Post*

*Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011), *i.e.*, because plaintiff Equal Rights Center

("ERC") "chose" to expend its resources to investigate Post's allegedly discriminatory

practices, it could not prove it suffered the requisite injury to establish standing.  Pls' Opp. at p.

23 (emphasis added).  Plaintiffs equate ERC's "choice" there with the concept of "self-inflicted

injury" that Defendants argue defeats Plaintiffs' claims.  Plaintiffs, however, are conflating

concepts.

      ONE DC's "mission" cannot have suffered injury from Defendants' alleged

discriminatory conduct because, according to Plaintiffs' own Complaint, that mission is to

organize against and, if necessary, file suit to prevent projects such as Mid-City's from going

forward, absent "corrective" measures of the sort Plaintiffs are asking this Court to impose.

Thus, in paragraph 112 of its Complaint, when Plaintiffs describe their challenge to Mid-City's

PUD as "a new organizing project," they are representing their mission is to undertake

"organizing projects" such as they undertook to stop in its tracks the implementation of Mid-

City's approved PUD.  Moreover, in paragraph 116, when they reference "organizing efforts"

ONE DC purportedly undertook "to investigate and resist the redevelopment of Brookland

Manor," they are reiterating that such is what ONE DC does as a matter of course.  Taken

together, ONE DC's organizational mission is to do precisely what it has done here, *i.e.*,

identify proposed development projects which, in its view, violate the Fair Housing Act and

then do what it deems necessary to avert the discrimination, real or potential, it has identified.

That is what is meant by courts in using the term "self-inflicted."

20

*Post Properties*, in fact, makes this same point.  There, ERC identified its mission as "provid[ing] counseling and education services to individuals seeking housing . . ., sponsor[ing] education and training seminars . . ." and so forth.  *Post Properties*, p. 1137.  But, ERC chose to "test" Post Properties apparently because it learned that it might be engaging in unlawful discrimination.  ERC's case failed because its proof of injury to its mission through that testing, and later-filed lawsuit, failed to identify precisely what activities it undertook to counteract the effect of the alleged discrimination.  ERC also failed to identify specific activities that detracted from its overall mission or activities it claims it undertook to address that purported detraction were undertaken.  *Id.*, p. 1141.

ONE DC, unlike ERC, has never identified, other than in the most nebulous manner, that its mission is or ever has been anything other than what it set out in paragraphs 112 and 116 of the Complaint.  Having failed in that regard, it has obviously also failed to identify other activities it engaged in that were impaired by Mid-City's PUD application, much less any resources it diverted from those activities to address Defendants' alleged discrimination.

Indeed, in *Post Properties*, the Court reaffirmed that "while a plaintiff organization's diversion of resources to "test" a defendant might harm its other programs, the injury was "self-inflicted" as a result of the organization's "own budgetary choices."  *Id.*, p. 1139, citing *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276, 307 U.S. App. 401 (D.C. 1994).  The Court's point was that while discrimination might make an organization's "overall task" more difficult - *BMC Marketing*, p. 1148 - the expenditure of funds to find out if such discrimination is, in fact, occurring is not a cognizable injury.

ONE DC's "overall task", its organizational mission, then, is to do precisely what it has done with respect to Mid-City's PUD, *i.e.*, do what it can to stop in their tracks development

projects it views as discriminatory.  While, prior to filing this suit, it may have expended

resources to "test" Mid-City's PUD against what is permissible under the Fair Housing Act,

and organizing to challenge the project, such does not allow for the conclusion that ONE DC's

"overall task," *i.e.*, other types of activities it engages in as part of its overall mission, were

impacted in any way.  To do that, it would have to first identify just what those activities are,

and it has conspicuously failed to do that.

VIII.   ASSOCIATIONAL STANDING

Plaintiffs' assertion of associational standing as a membership organization fares no

better.  The two individual plaintiffs, Ms. Borum and Ms. Holloman, are not expressly

identified as among ONE DC's members, yet their circumstances make Defendants' point as to

why individualized proof of its members is required.

In *Hope, Inc. v. County of Dupage, Illinois*, 738 F.2d 797 (7th Cir. 1984), wherein the

plaintiff organization challenged a county's zoning ordinances as violative of the Thirteenth

and Fourteenth Amendments, the court set forth succinctly the very type of problem ONE DC

faces here:

> The problem with HOPE's standing in its representational
> capacity is that it has not alleged much less proven that any of its
> members or directors either suffered an injury or was threatened
> with immediate injury to the extent that the member of director
> would be able to make out a justiciable case had he brought suit
> himself (the same problem facing the individual plaintiffs).  Since
> HOPE has not demonstrated that any party that it represents as a
> "member" has standing, it cannot have standing as that member's
> representative.

*Id.*, p. 814.

Plaintiffs here allege that ONE DC's members include persons who do and do not

reside at Brookland Manor.  Compl. at para. 109.  However, more than that, Plaintiffs do not

explain of whom ONE DC's members consist, and what it is that qualifies that person (or

entity) to be a member including Brookland Manor residents on whose behalf ONE DC alleges

it is representing in this case.  Does membership require proof of real or potential exposure to

"familial status" discrimination, specifically the type alleged here, *i.e.*, being unable to move

back to the newly-developed Brookland Manor because it will have fewer three-bedroom units

and no four- or five-bedroom units, then how can that be shown other than on a case-by-case

basis?  One certainly cannot reach any conclusion on this issue by reviewing the facts alleged

in the Complaint.  In other words, allegations supporting ONE DC's representational capacity,

*i.e.*, that it brings this action "as a representative of its members who are residents of Brookland

Manor and have minor children" (Compl. at para. 109), are wholly deficient to establish

associational standing.

Equally deficient is ONE DC's bare allegation that "the participation of individual ONE

DC members in the action is not required to resolve the claims at issue or to formulate

appropriate relief."  Compl. at para. 110.[13]  Accordingly, this Court should hold that the

allegations of the Complaint fail to establish ONE DC's standing and ONE DC should be

dismissed as a party.

IX.     DISMISSAL SHOULD APPLY TO ALL OF PLAINTIFFS' CLAIMS

In an attempt to retain at least a portion of their claims, Plaintiffs argue that even if this

Court grants the motion, it should not dismiss Plaintiffs' claims alleging discriminatory

statements under Counts III and IV because such counts are not specifically referenced in the

motion.  Pls' Opp. at p. 3, n.1.  What Plaintiffs fail to recognize is that like their disparate

impact claims, their claims alleging discriminatory statements are based on the same false

---

[13]   As Defendants noted in their Dismissal Brief, the need for "individualized proof" trumps an
assertion of associational standing.  See Defs' Dismissal Brief at 33-35; *Community Stabilization
Project v. Cuomo*, 199 F.R.D. 327 (D. Minn. 2001).

4842-5364-2042.v1

premise that large families are a protected class.  Moreover, statements by Mid-City that the

changing trends in urban land development have gone away from the construction of four-

bedroom and five-bedroom apartments are no different than urban development trends

recognized by other courts.  For example, in *English Woods Civil Ass'n*, *supra*, a tenants

association challenged the "occupancy consolidation" plan of a local housing authority, which

plan called for the demolition of a public housing development which sustained considerable

wear and degeneration over time, and disbursement of its residents into multiple housing

projects throughout the city.  In rejecting plaintiff's claim that the plan had a discriminatory

intent and produced a disparate impact against African-Americans (who occupied 95% of the

development), the federal trial court acknowledged that modern trends in public housing have

gone away from the concept of concentrated large public housing developments to the concept

of scattered, smaller developments made more possible through the use of housing choice

vouchers.  The allegedly discriminatory statements the Complaint alleges against Defendants

regarding development trends on apartment size and the reasons behind them, are no different

than the statements regarding development trends supporting plans such as the occupancy

consolidation plan of *English Woods*.  See also *Debolt v. Espy*, *supra*, 832 F. Supp. at 215 (The

lack of three-bedroom and four-bedroom apartments "is the product of a rational, market-based

process.").  Moreover, statements made by Defendants in the course of their pursuit of a zoning

application cannot be a source of liability because they are immune under the Noerr-

Pennington Doctrine.  *See*, *e.g.*, *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th

Cir. 1980) (Noerr-Pennington immunity applies to statements made in the course of a zoning

proceeding.).  Finally, as Defendants pointed out in their Dismissal Brief, elimination of

Plaintiffs' federal claims dictates that the rest of Plaintiffs claims be dismissed as failing the test for supplemental jurisdiction.  *Id.* at p. 18, n.7.

CONCLUSION

For all of the foregoing reasons, Defendants renew their request that the Motion to Dismiss be granted.[14]

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

October 6, 2016

/S/ William C. Casano
Richard W. Luchs, #243931
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone:  (202) 452-1400
Facsimile:  (202) 452-1410
Email:  rwl@gdllaw.com
Email:  wcc@gdllaw.com
*Counsel for Defendants Brentwood Associates Limited Partnership, Edgewood Management Corporation, and Mid-City Financial Corporation*

---

[14]   Given the page constraints imposed on reply briefs, Defendants do not address here Plaintiffs' arguments concerning Younger abstention and exhaustion of remedies, but instead rely upon Defendants' arguments as expressed in the Dismissal Brief.

25