# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ADRIANN BORUM, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 16-1723 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 3, 16 |
| | : | | |
| BRENTWOOD VILLAGE, LLC, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I. INTRODUCTION

At first glance, this case places the Court in the unenviable position of either standing in the way of residential redevelopment or jeopardizing the homes of families who depend on the status quo. Defendants are several companies planning to redevelop their existing apartment complex into a more modern development with many more one- and two-bedroom units. Plaintiffs are a nonprofit organization and two tenants, purporting to represent a class, who contend that Defendants' elimination of many three-, four-, and five-bedroom apartments in the process will disproportionately impact families in violation of the Federal Fair Housing Act and a comparable District of Columbia statute. Plaintiffs seek preliminary injunctive relief on the grounds that they face imminent irreparable harm if Defendants proceed with their redevelopment plan. Defendants counter that any of the alleged injuries would not occur until years down the road. They also move to dismiss on several procedural grounds, and because Plaintiffs "cherry-pick" a narrow demographic—"large families"—from the entirety of the class protected under the FHA—families—and focus only on the destruction of certain apartments and

not the construction of many more.  Because Defendants' procedural arguments are flawed and

Plaintiffs do not cherry-pick data, the Court will deny the Motion to Dismiss.  Because Plaintiffs

do not adequately show that the threatened injuries are imminent, the Court will deny the Motion

for a Preliminary Injunction.

## II.  FACTUAL BACKGROUND

### A.  Complaint[1]

Defendants Brentwood Associates, L.P.,[2] Mid-City Financial Corporation, and

Edgewood Management Corporation are owners of an affordable housing development located

in Northeast D.C.  *See* Compl. ¶ 3, ECF No. 2.  They are in the process of redeveloping their

deteriorating 75-year-old buildings, in part by increasing the total number of units but decreasing

the number of larger-sized apartments.  *See* District of Columbia Zoning Commission, Order No.

14-18, Case No. 14-18 at 33 (Mid-City Fin. Corp.) (Sept. 10, 2015), *available at* ECF No. 4-18

[hereinafter *Mid-City Fin. Corp.*, Z.C. Case 14-18];[3] Compl. ¶¶ 4–5.  Their redevelopment plan

---

[1] Because the Court considers different information when analyzing a motion to dismiss than it does with a motion for a preliminary injunction, the relevant facts are divided into two sections.

[2] Per stipulation, Plaintiffs have voluntarily dismissed the case against Defendant Brentwood Village, LLC, because Brentwood Village does not have an ownership interest in the property subject to the suit.  *See* Notice of Voluntary Dismissal, ECF No. 12.

[3] With respect to Defendants' Motion to Dismiss, the Court takes judicial notice of the facts in the District of Columbia Zoning Commission proceeding involving Defendants and their proposed redevelopment only to "avoid unnecessary proceedings when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim upon which relief could be granted."  *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (internal citation and quotations omitted).  The Court takes into account only uncontested facts, and does not "review[] the entire record," which would require conversion of the Motion to Dismiss into a motion for summary judgment.  *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1228 (D.C. Cir. 1993) (Mikva, C.J., dissenting).  Plaintiffs never dispute Defendants' invocation of the Zoning Commission's order as a basis for its factual claims.  *See generally* Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 21 (Plaintiffs even specifically

calls for the elimination of 113 four-bedroom and 21 five-bedroom apartment units.  *See* Compl.
¶¶ 32, 46.  In light of social, economic, and practical considerations, the D.C. Zoning
Commission agreed with Defendants that, like in other developments nationwide, it would not be
economical to build four- and five-bedroom units.  *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at
52, 56.  The plan also calls for the decrease of three-bedroom apartments from 75 to 64 units.
Compl. ¶ 47.  In all, the redevelopment would decrease the number of three-, four-, and five-
bedroom apartments from 209 to 64.  *Id.* ¶ 5.  It would also displace at least 119 households—the
majority of which are families—currently residing at Brookland Manor.  *Id.* ¶¶ 50–53, 75.  Even
the remaining three-bedroom apartments might not be affordable, "further reducing the available
housing for larger families."  *Id.* ¶ 52.  Defendant Mid-City's Vice President Michael Meers
testified before the D.C. Zoning Commission that "all residents in good standing shall have the
opportunity to return to the redeveloped property . . . [a]nd when relocations do occur[,]
ownership will pay for all packing and moving expenses."  *Id.* ¶ 54.

 Plaintiffs allege that the redevelopment plan would have a disparate impact on families.
*See id.* ¶¶ 69–79.  Among the 486 occupied units at Brookland Manor, 253 (52%) are occupied
by "families" that Plaintiffs claim are within the relevant statutory definitions, which the
Complaint defines as "those who have one or more minor children living in the household."  *See
id.* ¶ 72.  Of the 303 one- and two- bedroom apartments, only 104 (34%) are occupied by
families, as defined by Plaintiffs.  *Id.* ¶ 74.  Of the 183 three-, four-, and five-bedroom units, 149
(81%) are occupied by families.  *Id.*  Taken together, 149 families—comprising 59% of families
overall—are at risk of displacement because of the development, compared to only 34 non-

_____

state that they "are not challenging the Zoning Comission's approval of Mid-City's stage-one
PUD application").

families—15% overall.  *Id.* ¶ 77.  The new development would contain about 1,760 units,

including 1,646 apartments.  *Id.* ¶¶ 48.  There are currently around 535 apartment units at

Brookland.  *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at 7.

      Individual Plaintiffs—Ms. Adriann Borum and Ms. Loretta Holloman—allege that

redevelopment would force them out of their homes and subject them to multiple forms of injury.

*See* Compl. ¶¶ 80–107.  Ms. Borum lives in a four-bedroom apartment unit with her five

children, who range in age from 7 to 21.  *Id.* ¶¶ 94–95.  She and her children depend on the local

community for academic, religious, and recreational support.  *Id.*  ¶¶ 97–101.  If the family is

involuntarily displaced, "Ms. Borum will have an extremely difficult time finding an

adequately[-]sized apartment in D.C. for her family because of the scarcity of affordable housing

of her unit type."  *Id.* ¶ 105.  Ms. Holloman lives with her mother, brother, and three school-aged

children in a four-bedroom Brookland Manor apartment.  *Id.* ¶¶ 80–81.  Her brother and one of

her children are both autistic and attend a special-needs programs—one for children and one for

adults—in the community.  *Id.* ¶ 82–83.  She too will have a difficult time finding a replacement

apartment for her family, may have to move outside of D.C., and will lose the irreplaceable

community on which she and her family depend.  *See id.* ¶¶ 82–91.

      Individual Plaintiffs bring this case on behalf of themselves and "all others similarly

situated" including "[a]ll households who reside or have resided at Brookland Manor in a three-,

four-, or five-bedroom unit with one or more minor child," and who have either been displaced

or are at risk of being displaced by Defendants' proposed redevelopment project.  *See id.* ¶ 122.

Plaintiffs allege that at least 149 families are in the Proposed Class, and that the redevelopment

will have "the same impact on all class members."  *Id.* ¶¶ 125–27.  According to Plaintiffs, all

members of the Proposed Class are interested in the case because the redevelopment project

significantly decreases the amount of available housing suitable for families, would have a disparate impact on families, and may have been motivated by a discriminatory purpose. *See id.* ¶ 127. Moreover, Plaintiffs argue, a single injunction would afford the primary relief that members of the Proposed Class seek. *Id.* ¶ 137.

The final Plaintiff, community organization ONE DC, is "comprised of members who include tenants of affordable housing properties that are seeking to avoid displacement, preserve affordable housing, ensure fair housing, and further equitable development in D.C." *Id.* ¶ 108. ONE DC seeks this injunction "on its own behalf and as a representatives of its members, including members who are residents of Brookland Manor and have minor children." *Id.* ¶ 109. It further asserts that Defendants' conduct has directly "damaged ONE DC by frustrating its mission of creating and preserving racial and economic equity in D.C. for all and by causing ONE DC to divert scarce organizational resources," particularly given that the organization has only two fulltime staff members. *See id.* ¶¶ 111–12. As a result of Defendants' actions, ONE DC diverted its resources from its mission to "crisis organizing" through "identifying, investigating, and combating Defendants' discriminatory policies and practices, and to counseling, organizing, and reassuring tenants who have been forcibly moved or have feared imminent displacement under Defendants' proposed redevelopment plan." *Id.* ¶ 113, 118. For example, after hearing about the proposed redevelopment, ONE DC organized a series of "Outreach Days." *Id.* ¶¶ 114–16. In all, ONE DC alleges that, as of July 28, 2016, it had spent 640 staff-hours on "combat[ing] Defendants' discriminatory conduct." *Id.* ¶ 121.

To implement their redevelopment, Defendants have petitioned the D.C. Zoning Commission through the "planned unit development (PUD) process." *See id.* ¶ 43; D.C. Mun. Regs. tit. 11-X, § 300. In October, 2014, Defendants submitted an application for a First-Stage

PUD and Related Zoning Map Amendment ("First-Stage PUD") with the D.C. Zoning

Commission.  Compl. ¶ 44; *see generally* D.C. Mun. Regs. tit. 11-X, § 302.  The Zoning

Commission approved the First-Stage PUD application in June, 2015, and its order became final

on November 6, 2015.  Compl. ¶ 56.  Now, Defendants have filed a Second-Stage PUD

application, the approval of which would allow Defendants to begin redevelopment and

destruction of Plaintiffs' apartments.  *See* Pl. Reply Mem. in Supp. of Mot. for Prelim. Inj., at

17–18, ECF No. 20; Compl. ¶ 57.

    During the course of the redevelopment process, Defendants made comments that

Plaintiffs allege are discriminatory.  *See* Compl. ¶ 59.  In a December 2014 letter to the

Brookland Manor Residents Association, Defendant Mid-City stated that four- and five-bedroom

apartments are "not an ideal housing type for larger families and there are adverse impacts on the

remainder of the community."  *Id.* ¶ 61.  The following month, Mid-City said that there would

not be four- or five-bedroom units because they are "not consistent with the creation of a vibrant

new community."  *Id.* ¶ 62.  Then, in an April 2015 hearing in front of the Zoning Commission,

Defendant Mid-City, representing Brentwood Village, said that "[c]ommunities and

organizations throughout the country are in agreement that housing very large families in

apartment complexes is significantly impactful upon the quality of life of households as well as

their surrounding neighbors.  Therefore, [Defendants do] not propose to construct four or five

bedroom units in the project."  *Id.* ¶ 60.

    Plaintiffs now allege that Defendants violated the Federal Fair Housing Act ("FHA") by

undertaking the redevelopment project that will disproportionately reduce the amount of

apartments available for families, which they allege constitutes discrimination on the basis of

familial status.  *See id.* ¶¶ 140–50.  Plaintiffs further allege that Defendants violated the District

of Columbia Human Rights Act ("DCHRA") on similar grounds.  *See id.* ¶¶ 151–62.  Plaintiffs

make separate claims under both statutes alleging discriminatory statements, because of

Defendants' statements suggesting that housing for large families is incompatible with the

community they seek to create.  *See id.* ¶¶ 163–78.  Defendants do not aim the Motion to

Dismiss at Plaintiffs' claims about these alleged statements.

Plaintiffs' Complaint seeks certification of a class, a judgment declaring that the

proposed plan's decrease of the number of units available for certain families violates the FHA

and DCHRA, "any and all injunctive relief that the Court may deem appropriate," compensatory

and punitive damages, and attorneys' fees.  *See* Prayer for Relief, Compl. at 35–36.

## B.  Motion for a Preliminary Injunction

In addition to the above allegations, Plaintiffs and Defendants each put forward evidence

for consideration of Plaintiffs' Motion for a Preliminary Injunction.

### 1.  Plaintiffs' Evidence

Plaintiffs put forth evidence that they argue shows that Plaintiffs face threats of injury if

the redevelopment project proceeds.  They submit a statement from Defendants to the Zoning

Commission confirming the numerical allegations in the Complaint.  *See* Pls.' Mem. in Supp. of

Mot. for Prelim. Inj. Ex. 12, ECF No. 4-13.   To digest the redevelopment plan in numerical

terms, they also submit the declaration of a social-statistician, Dr. Andrew Beveridge.  *See* Pls.'

Mem. in Supp. of Mot. for Prelim. Inj. Ex. 1 ("Beveridge Decl."), ¶ 9, ECF No. 4-2.  Based on

his analysis of the redevelopment plans, he states that "families would be more than four times as

likely as non-families to be adversely affected by the planned redevelopment because 58.9[%] of

the families at Brookland Manor live in three-, four-, or five-bedroom units . . . [and] [i]n

contrast, only 14.6[%] of non-families live in such . . . units." *See id.* ¶ 9.  Dr. Beveridge further

Case 1:16-cv-01723-RC   Document 29   Filed 11/21/16   Page 8 of 40


asserts that families will face difficulty finding new housing, or, for the few families that might be able to remain at Brookland, overcrowding. *See id.* ¶¶ 10–11.

Individual Plaintiffs assert specific injuries that they will suffer if Defendants carry out the redevelopment. Ms. Holloman claims in a declaration that she and her family will "suffer displacement," and leave her along with her "aging mother, brother with special needs, and three minor children with nowhere to go." *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 5 ("Holloman Decl."), ¶ 9(a), ECF No. 4-6. She predicates this assertion on her "strong[] belie[f] that [she] will be unable to find housing that will accommodate [her] family's size and special needs" within the community and at an affordable price. *See id.* ¶ 9(a)(i). She specifically worries that her mother will be unable to continue her "essential" career training classes, her brother will lose his "essential" special-needs program, her autistic son will lose his "crucial" special needs classes, her other children will lose their local schooling, and the whole family will lose its community connections. *See id.* ¶¶ 9(a)(i)–(vi). Ultimately, she is "concerned that [her] family could be forcibly broken up," leaving her separated from her children. *See id.* ¶ 9(b). In addition to the toll moving would take on her family, she claims she will suffer her own emotional distress. *See id.* ¶ 9(e). Ms. Borum similarly asserts that without a four-bedroom unit she and her family cannot reside at Brookland, putting her family at risk of displacement or fragmentation. *See* Pl.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 4, ¶ 9(a), ECF No. 4-5. She claims that she personally is "aware of" other families who have "been asked to leave the property" or been "broken up." *See id.* ¶ 8. Like Ms. Holloman, Ms. Borum believes the redevelopment would make it impossible for her and her family to remain in the community. *See id.* ¶ 9(a).

To bolster their claims that Defendants' redevelopment will displace or break apart families, Plaintiffs submit second-hand declarations of people who claim they know of other families who have been forced to relocate. *See id.* ¶ 8; Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 9 ("McFadden Decl."), ¶ 6, ECF No. 4-10 (declaration of tenant Reginald McFadden, wherein he asserts that he is "aware of other families who have already had to transfer to another unit . . . , had their families broken up into smaller units, or been asked to leave"); Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 10 ("Scott Decl."), ¶ 6, ECF No. 4-11 (declaration of tenant Valarie Scott asserting the same); Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 8 ("Jenkins Decl."), ¶ 6, ECF No. 4-9 (declaration of tenant Javon Jenkins asserting the same). Although Plaintiffs acknowledge that Defendants will allow families the right to return to Brookland, *see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 15, at 3, ECF No. 4-16, they argue that families cannot do so without larger apartments, which are scarce in the District of Columbia, *see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 2 ("Merrifield Decl."), ¶ 27, ECF No. 4-3. Plaintiffs assert that families who rely on Section 8 vouchers to subsidize their rent payments will be particularly affected by redevelopment, because units available to lower-earning households are even scarcer than they are for the general population. *See* Merrifield Decl., ¶¶ 18, 32–34.

Plaintiffs also produce evidence that they argue shows that the threatened injuries against Plaintiffs are imminent, if not occurring already. *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 26, ECF No. 4. As noted above, several tenants argue that they know of families who have been forcibly moved or separated by Defendants. More broadly, Plaintiffs argue that "Defendants will soon receive final approval of their proposed redevelopment." *See id.* at 13. The D.C. Zoning Commission gave first-stage PUD approval to Defendants' redevelopment plan, and Defendants submitted an application for second-stage PUD approval weeks before it

was due.  *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 17, ECF No. 4-18 (D.C. Zoning

Commission approval); Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj. Ex. 2, ECF No. 20-2

(Defendants' stage-two application, dated September 20, 2016); Defs.' Mem. in Supp. of Mot. to

Dismiss, at 9, ECF No. 16-1 (noting that Defendants were required to submit a stage-two

application by November 6, 2016).  Plaintiffs argue that Defendants' early submission of the

stage-two application shows just how quickly they intend to implement the redevelopment.  *See*

Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj., at 12.  With Defendants' submission of

another application for stage-two approval, the Zoning Commission can immediately consider

the proposal, and if the Commission gives approval, Defendants may begin redeveloping

immediately thereafter.  *See* D.C. Mun. Regs. tit. 11-Z, § 702.  At that point, Plaintiffs argue,

there will be no way to stop Defendants from inflicting irreparable injuries upon Plaintiffs.  *See*

Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 14.  Plaintiffs further argue that a recent filing

with the Zoning Commission shows that the first phase of redevelopment will affect a building

that is made up almost entirely of three- and four-bedroom units.  *See* Pls.' Reply Mem. in Supp.

of Mot. for Prelim. Inj. Ex. 3, at 1, ECF No. 20-3.

   To show that Defendants do not want "large families to reside on their property," *see*

Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 15, Plaintiffs put forth statements made by

Defendants in connection with the redevelopment project.  *See* Pls.' Mem. in Supp. of Mot. for

Prelim. Inj. Ex. 12, at 6; Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 18, at 8, ECF No. 4-19.

In a submission to the Zoning Commission, Defendants stated that "housing very large families

in apartment communities is significantly impactful upon the quality of life of households as well

as their surrounding neighbors."  *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 12, at 6.

Then, in response to a question from tenants, Defendants stated that they would "not build any

10

new [four-bedroom] or [five-bedroom] apartment flats as our practical experience has

demonstrated that it is not an ideal housing type for larger families and there are adverse impacts

on the remainder of the community." *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. Ex. 18, at

8.

## 2.  Defendants' Evidence

Defendants produce evidence telling a different story.  According to Michael S. Meers,

Executive Vice President of Defendant Mid-City Financial Corporation, the redevelopment is an

innocuous response to two principal concerns.  *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. Ex.

1 ("Meers Aff."), ¶ 1, ECF No. 18-1.  First, "[t]he existing buildings are now 75 years old and

are functionally obsolete with all of the major systems requiring replacement," with the property

last having been renovated over 40 years ago.  *Id.* ¶ 6.  The District of Columbia Office of

Planning concurred with Defendants that "the buildings and the infrastructure [of Brookland] are

not optimally functional."  *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at 64.  Second, "the urban

design of the original community and buildings . . . has resulted in the property not being as

safe" as it could be because of crime.  Meers Aff. ¶ 7.  Mr. Meers attributes the "ongoing crime

problems" to the street configuration's lack of conduciveness to "efficient pedestrian and

vehicular access through the subject property," resulting in a kind of isolation from the

surrounding community.  *See id.*  In addition, Defendants plan to provide many more homes for

all—regardless of familial status—by expanding the existing 535 apartment units to 1,760 total

units, including 1,646 apartments.  *See id.* ¶ 8, 10.  The Zoning Commission agreed with

Defendants that including larger units would be impractical.  *See Mid-City Fin. Corp.*, Z.C. Case

14-18, at 52, 56.   As for the families who claim to require larger units, Defendants indirectly

invoke a study purportedly showing that several Brookland tenants currently reside in apartments

that are too big for their respective occupants, based on "the HUD guidelines of two persons per

bedroom," so that only "13 exiting households would require four bedrooms and no household

would require five bedrooms." *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at 38.  The Zoning

Commission favorably cited the D.C. Office of Planning as having considered this information

prior to stage-one PUD approval, *see id.* at 35–38, but neither the HUD guidelines nor the study

are themselves in the record.  The Office of Planning also found that Defendant planned to

maintain "[t]he building with the larger units . . . until the later phases at which time they can be

'right sized' to accommodate larger families."  *See id.* at 38.

Defendants emphasize that any displacement of tenants would not occur until years down

the road, during later phases of the redevelopment project.  *See* Defs.' Opp'n to Pls.' Mot. for

Prelim. Inj., at 6, ECF No. 18.  Defendants plan to implement the redevelopment project in three

phases.  *See id.*  During "Phase One" in late 2017, three of the current 19 buildings that

constitute Brookland Manor will be replaced by 28 for-sale units and 200 senior-citizen units.

*See* Meers Aff. ¶ 17.  These buildings are called "Block 7."  *See Mid-City Fin. Corp.*, Z.C. Case

14-18, at 50.  All residents in those three buildings will be "relocated at ownership expense to an

appropriate apartment home on the property."  *Id.*  Some tenants have been moved, but "[n]o

tenant in [the three affected buildings] has been forced to move outside the development as a

result of any failure to accommodate that tenant elsewhere in the development."  *See* Meers Aff.

¶ 17.  Because Defendants would need the units created by Phase One to relocate tenants, Phase

Two and Phase Three will not begin until 2019.  *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at

50.  Individual Plaintiffs would not need to vacate during Phase One.  Defendants do not

anticipate forcing Ms. Borum to relocate until "at least 2020" or forcing Ms. Holloman to

relocate "until 2023."  Meers Aff. ¶¶ 18–19 (also declaring that any communication concerning

relocation "will not happen until the year 2020 at the earliest for Plaintiff Borum, and the year 2023 at the earliest for Plaintiff Holloman").  The record does not show that any of the affiants that Plaintiffs cite in their motion, *see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 10, will be required to move away from Brookland as a result of the redevelopment until after Phase One. *See generally* Meers Aff.; Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. Ex. 2 ("Sanquist Aff."), ¶ 6, ECF No. 18-2.

If a preliminary injunction were to be granted, Defendants argue, they would be severely harmed.  "Based on the Zoning Commission's approval, Mid-City has subsequently expended significant capital on architecture, landscaping, engineering, legal services[,] and financing opportunities in anticipation of . . . construction phasing outlined in the approved PUD."  Meers Aff. ¶ 23.  Not only will this mean that Defendants "would suffer enormous financial harm," but it might mean that they would be unable to build the additional units and "be forced to re-evaluate the commitment to voluntarily retain the Section 8 contract that assists 373 very-low income families in the District of Columbia."  *Id.* ¶ 24.  In fact, "[i]n the case of delay, Mid-City could be forced to leave the aging property 'as is' and convert the existing units to true unrestricted market rate units."  *Id.*

## III.  ANALYSIS

Plaintiffs move for a preliminary injunction.  In the Motion for a Preliminary Injunction, Plaintiffs move for the Court to enjoin Defendants from submitting a second-stage PUD application.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 3.  In the Complaint, Plaintiffs request "any and all injunctive relief that the Court may deem appropriate, including entering a preliminary . . . injunction ordering Defendants to . . . cease violating" Plaintiffs' rights under the Federal Fair Housing Act and District of Columbia Human Rights Act.  *See* Prayer for Relief, Compl. at 35–

36.  After Plaintiffs filed their Complaint and Motion for a Preliminary Injunction, Defendants

submitted a second-stage PUD application, *see* Pls.' Reply Mem. in Supp. of Mot. for Prelim.

Inj. Ex. 2, making the specific request in Plaintiffs' Motion for a Preliminary Injunction moot.

Nonetheless, the Court considers Plaintiffs' request for an appropriate preliminary injunction to

remedy their injuries.[4]

Using a theory of disparate impact, Plaintiffs argue that the redevelopment plan "will

effectively eliminate housing for the majority of large families at the Brookland Manor

property," and that without a preliminary injunction, "it is almost certain that the nearly 150

families now resident at Brookland Manor will lose their housing during the pendency of this

litigation."  *See* Pls.' Mot. for Prelim. Inj., at 1.  Defendants oppose a preliminary injunction,

arguing that the alleged injuries are not imminent, Plaintiffs are unlikely to be successful on the

merits, and that preliminarily enjoining the redevelopment would significantly harm Defendants

and the public.[5]  *See generally* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.

Defendants move to dismiss on a number of grounds.  They advance four procedural

arguments: first, that Plaintiffs did not exhaust their administrative remedies through the zoning

---

[4] In their Reply Memorandum, Plaintiffs assert that they "now modify the requested form of relief and seek to enjoin Defendants from taking any action towards residents meant to effectuate their challenged redevelopment plan, including relocating tenants on or off the property, evicting, moving, or otherwise bringing about the cessation of tenancy in preparation for . . . redevelopment."  Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj., at 18, ECF No. 20. Plaintiffs did not move to amend their request for a preliminary injunction.  However, because these are possible "appropriate" forms of a preliminary injunction meant to preserve Plaintiffs' rights, the Court will consider them with respect to any preliminary injunction it might issue.

[5] Defendants previously argued that Plaintiffs' proposed injunction preventing the filing of a second-stage PUD application would have violated the United States Constitution because it would block access to the Zoning Commission and constitute a prior restraint.  *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj., at 11–13.  As Plaintiffs acknowledge, because Defendants already submitted their application, the Court is unable to impose such an injunction, making the argument moot.  *See* Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj., at 17–18.

process, so principles of "'*res judicata*' and/or collateral estoppel" preclude relief; second, that the Court does not have jurisdiction under the *Rooker–Feldman* doctrine, because review would constitute an appeal of a state-administrative proceeding; third, that the Court should dismiss on *Younger* abstention grounds, because the case involves important D.C. matters; and fourth, that ONE DC lacks standing.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 9–10.  In the substantive realm, Defendants move to dismiss on the grounds that Plaintiffs impermissibly cherry-pick the scope of both the protected class and alleged discriminatory action.

The Court will first address Defendants' Motion to Dismiss, then move to Plaintiffs' Motion for a Preliminary Injunction.

## A. Defendant's Motion to Dismiss

Defendants' arguments concerning exhaustion, *Younger* abstention, and Plaintiffs' data interpretation are non-jurisdictional in nature and ask the Court to determine whether Plaintiffs' complaint states a cognizable claim.  *See William Penn Apartments v. D.C. Court of Appeals*, 39 F. Supp. 3d 11, 19 (D.D.C. 2014) (analyzing *Younger* abstention in the context of a 12(b)(6) motion instead of a 12(b)(1) motion); *Johnson v. District of Columbia*, 368 F. Supp. 2d 30, 36 (D.D.C. 2005), *aff'd*, 552 F.3d 806 (D.C. Cir. 2008) (noting that "in cases where state courts properly treat a state administrative exhaustion requirement as a matter of subject matter jurisdiction . . . similar jurisdictional status for that state-law exhaustion requirement in federal courts will not be theoretically justified").  To survive such a motion a complaint must contain sufficient factual allegations that, if accepted as true, would state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Instead, plaintiffs must "nudge[] their claims across the line from conceivable to plausible."  *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  "In evaluating a Rule 12(b)(6) motion to dismiss, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties."  *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (internal citations and quotations omitted).

In contrast, Defendants' *Rooker–Feldman* and standing arguments concern whether the Court has subject-matter jurisdiction over the case at all.  *See Bradley v. DeWine*, 55 F. Supp. 3d 31, 41 (D.D.C. 2014) (Rooker–Feldman doctrine); *Cheeks v. Fort Myer Const. Co.*, 722 F. Supp. 2d 93, 108 (D.D.C. 2010) (standing).  Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  Thus, it is the plaintiff's burden to establish that the Court has subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering whether it has jurisdiction, a court must accept "the allegations of the complaint as true." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

The Court will analyze Defendants' Motion to Dismiss using these standards, beginning first with Defendants' procedural arguments before moving to their argument that Plaintiffs do not state a cognizable claim.

1.  Exhaustion

Defendants argue that because Plaintiffs knew about the Zoning Commission proceedings but did not choose to challenge the proposed redevelopment, both their FHA and DCHRA claims are barred by the doctrines of exhaustion and preclusion.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 18–19.  The Court will address Defendants' argument starting with an analysis of the FHA before moving to the DCHRA.

*a.  Fair Housing Act*

Although Defendants do not bifurcate their analysis of exhaustion, the Court will begin with federal law.  In support of their exhaustion argument, Defendants invoke *Auger v. D.C. Board of Appeals & Review*, a District of Columbia Court of Appeals case, where the plaintiff sought review "of his administrative appeal from the District of Columbia's imminent enforcement of an order revoking his permit for a neon sign atop his hotel" and a preliminary injunction prohibiting authorities from removing the sign.  *See* 477 A.2d 196, 199 (D.C. 1984).  In *Auger*, the plaintiff did not administratively appeal his case, despite notice and an opportunity to do so.  *See id.* at 206.  As a result of the plaintiff's failure to exhaust, the District of Columbia courts did not have jurisdiction over the action.  *See id.* at 207.  Defendants further note that parties alleging injury from a Zoning Commission order can appeal their case to the D.C. Court of Appeals.  *See D.C. Library Renaissance Project/W. End Library Advisory Grp. v. D.C. Zoning Comm'n*, 73 A.3d 107, 119 (D.C. 2013); *see also York Apartments Tenants Ass'n v. D.C. Zoning Comm'n*, 856 A.2d 1079, 1081 (D.C. 2004).

Under 42 U.S.C. § 3613(a)(1)(A), "[a]n aggrieved person may commence a civil action in a[] . . . court . . . to obtain appropriate relief with respect to . . . [a] discriminatory housing practice or breach."  Thus, a plaintiff filing under § 3613 "may proceed directly into federal

court, deferring neither to the Secretary of Housing and Urban Development nor to state administrative and judicial processes." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 125 (1979).  Congress "carefully chose[] language" allowing immediate judicial recourse to individuals "directly victimized by a discriminatory housing practice." *Id.* at 125–26.  The fact that Plaintiffs had District of Columbia administrative remedies available is irrelevant.  As Plaintiffs argue, to require individuals seeking relief from an imminent violation of their federal rights to proceed through state-level administrative or judicial avenues would defeat the purpose—as evinced from the "carefully chosen language" of the statute—of the remedy that Congress provided.  *See id.* at 125.  The FHA "would be seriously undercut if Section 812 actions were conditioned upon prior exhaustion of state administrative remedies." *Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y.*, 689 F.2d 391, 393 n.3 (2d Cir. 1982) (analyzing state-level administrative zoning remedies).  Defendants cite cases analyzing the processes governing appeals of unfavorable District of Columbia zoning restrictions generally— but not in the context of the violation of federal rights.  *See Auger*, 477 A.2d at 200 (appeal of the denial of a permit to place a neon sign atop the plaintiff's hotel); *Capitol Hill Restoration Soc. v. Zoning Comm'n*, 287 A.2d 101, 102 (D.C. 1972) (appeal of a zoning application to build an office building); *C. Library Renaissance Project/W. End Library Advisory Grp.*, 73 A.3d at 111 (appealing "certain zoning requirements"); *York Apartments Tenants Ass'n*, 856 A.2d at 1081 (appealing an application to modify a PUD on procedural grounds).  Because Plaintiffs seek relief from alleged discrimination, Defendants' cases are inapposite and Plaintiffs' FHA claims are not barred for failure to exhaust.

Throughout their argument on exhaustion, Defendants invoke concepts of claim preclusion and issue preclusion, so the Court will address them separately.  Defendants argue

that "Plaintiffs' [indirect] challenge . . . to the Zoning Order is barred by jurisprudence on the preclusive effect of state administrative agency orders on later-filed [f]ederal claims involving matters decided in agency adjudicative proceedings." *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 24.   Defendants cite to *Univ. of Tennessee v. Elliott*, a case in which the Supreme Court reasoned that it saw "no reason to suppose that Congress, in enacting the Reconstruction civil rights statutes, wished to foreclose the adaptation of traditional principles of preclusion to such subsequent developments as the burgeoning use of administrative adjudication in the 20th century." *See* 478 U.S. 788, 797 (1986).   Even putting aside the technical requirements of claim and issue preclusion, *Elliott* is not controlling here.   Unlike in that case, where there was "no reason to suppose that Congress" intended to foreclose preclusion, as noted above, Congress "carefully chose[]" to allow plaintiffs to "proceed directly into federal court" to vindicate their federal rights.   *Gladstone Realtors*, 441 U.S. at 125–26.   This shows that "Congress did not intend for administrative determinations . . . whether issued by [federal] or certified state agencies, to preclude aggrieved parties from seeking vindication of their rights through civil actions." *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 146 (S.D.N.Y. 2015).   Thus, "it would make little sense to give res judicata effect to a proceeding," *Miller v. Poretsky*, 409 F. Supp. 837, 838 (D.D.C. 1976), whether federal or state, under the FHA.   *See id.*; *E. River Hous. Corp.*, 90 F. Supp. 3d at 146.   Accordingly, the Zoning Commission's findings do not have preclusive effect over Plaintiffs' FHA claims.

But even if Congress did intend for state-level administrative proceedings to have preclusive effect, the Court could not give such an effect here.   Both claim and issue preclusion require a ruling by "a court of competent jurisdiction." *See Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (claim preclusion); *Yamaha Corp. of Am. v. United States*, 961 F.2d

245, 254 (D.C. Cir. 1992) (issue preclusion).  The D.C. Zoning Commission has power to

"regulate the location, height, bulk, number of stories and size of buildings . . ., the percentage of

lot which may be occupied, the sizes of yards . . . and other open spaces, the density of

population, and the uses of buildings, structures, and land for trade, industry, residence,

recreation, public activities, or other purposes."[6]  D.C. Code § 6-641.01.  Although the

Commission does have the power to ensure that zoning regulations are consistent with the

District of Columbia's "comprehensive plan," *see Tenley & Cleveland Park Emergency Comm.*

*v. D.C. Bd. of Zoning Adjustment*, 550 A.2d 331, 332 (D.C. 1988), which, according to

Defendants, is "a broad framework intended to guide the future land use planning decisions for

the District of Columbia," *see* Defs.' Reply to Pls.' Opp'n to Mot. to Dismiss, at 15, ECF No. 24,

the Zoning Commission has no power to implement the plan.  *Tenley & Cleveland Park*

*Emergency Comm.*, 550 A.2d at 341 n.22.  Because DC's "broad framework" is not comparable

to the Federal FHA and Defendants do not identify any power to independently review private

FHA violations,[7] there is no indication that the District of Columbia Zoning Commission could

be considered a "competent" "court" for purposes of reviewing FHA claims.

---

[6] Defendants contend that this is not the proper provision providing the Zoning Commission with its powers.  *See* Defs.' Reply to Pls.' Opp'n to Mot. to Dismiss, at 15, ECF No. 24.  They cite part (a) of D.C. Code § 6-621.01 for the proposition that the Zoning Commission has general power "[t]o protect the public health, secure the public safety, and to protect property."  *See id.*  However, after this clause follows: "there is created a Zoning Commission."  *See* D.C. Code § 6-621.01(a).  Then, part (e), which grants the Commission its power, provides that "[t]he Zoning Commission shall exercise all the powers . . . with respect to zoning . . . *as provided by law*."  *See* D.C. Code § 6-621.01(e) (emphasis added).  So, although part (a) outlines broad *purposes* for creating a Zoning Commission, it does not by itself grant power.

[7] In their reply memorandum, Defendants assert that a footnote of a D.C. District Court "not[ed] that the Zoning Commission may find that regulations governing community-based residential facilities are violative of the FHA."  *See* Defs.' Reply to Pls.' Opp'n to Mot. to Dismiss, at 15.  In fact, this is not the case, at least using any meaningful definition of the word "find."  That footnote quoted the Zoning Commission as simply stating that a regulation "could

*b. D.C. Human Rights Act*

Defendants also seek dismissal of the DCHRA count on exhaustion grounds.  Similar to

the FHA, the DCHRA provides that "[a]ny person claiming to be aggrieved by an unlawful

discriminatory practice shall have a cause of action in any court of competent jurisdiction for

damages and such other remedies as may be appropriate, unless such person has filed a[n

administrative] complaint."  D.C. Code § 2-1403.16(a); *see also Williams v. District of

Columbia*, 467 A.2d 140, 141 (D.C. 1983) (noting that the DCHRA provides "direct resort to the

courts," but holding that government employees must exhaust administrative remedies in some

cases).  The plain language of the DCHRA commands the same finding as the language of the

FHA.  Because the Court is one of "competent jurisdiction" and Plaintiffs claim to be "aggrieved

by an unlawful discriminatory practice" under the DCHRA, Plaintiffs did not need to exhaust

any District of Columbia administrative remedies.  Given the arguably stronger language in the

D.C. statute ("[a]ny person . . . shall have a cause of action"), this reasoning applies equally to

issues of preclusion here.  Moreover, there is no indication that the District of Columbia Zoning

Commission is a competent "court" to review such a claim.  The Court will not give preclusive

effects to any findings by the Zoning Commission.

2. The *Rooker–Feldman* Doctrine

The Court next considers Defendants' argument that the Court lacks subject-matter

jurisdiction to consider this matter under the *Rooker–Feldman* doctrine.  Defendants argue that

review of this case would functionally constitute an appeal of a state-level judgment.  "The

*Rooker–Feldman* doctrine . . . is confined to . . . cases brought by state-court losers complaining

---

be subject to challenge under the provisions of the Fair Housing Amendments Act," not ruling on
it substantively.  *See Cmty. Hous. Tr. v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp.
2d 208, 223 n.18 (D.D.C. 2003).

of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The doctrine is rooted in the Supreme Court's appellate jurisdiction over state-court judgments granted by Congress. *See* 28 U.S.C. § 1257. In *D.C. Court of Appeals v. Feldman*, the Supreme Court "held that this grant of jurisdiction is exclusive." *Lance v. Dennis*, 546 U.S. 459, 463 (2006); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983). The doctrine is named after *Feldman* and the only other case where the Supreme Court has "applied this rule to find that a Federal District Court lacked jurisdiction," *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). *See Lance*, 546 U.S. at 463. In *Rooker*, the plaintiff sought Supreme Court review of an Indiana Supreme Court decision. *Id.* When the Supreme Court declined review, the plaintiff filed an action in a federal district court. *Id.* The Supreme Court "viewed the action as tantamount to an appeal of the Indiana Supreme Court decision, over which only [the Supreme] Court had jurisdiction, and said that the 'aggrieved litigant cannot be permitted to do indirectly what he no longer can do directly.'" *Id.* (quoting *Rooker*, 263 U.S. at 416). Sixty years later in *Feldman*, the Court applied the same reasoning to a District of Columbia Court of Appeals decision refusing admission to a bar applicant. *Id.* The Supreme Court emphasized the difference between a judicial decision and an administrative one, holding that "to the extent plaintiffs challenged the Court of Appeals decisions themselves—as opposed to the bar admission rules promulgated nonjudicially by the Court of Appeals—their sole avenue of review was with this Court." *Id.* "Neither *Rooker* nor *Feldman* elaborated a rationale for a wide-reaching bar on the jurisdiction

of lower federal courts, and [Supreme Court] cases since *Feldman* have tended to emphasize the narrowness of the *Rooker–Feldman* rule."[8]  *Id.* at 464.

As Defendants candidly point out, *see* Defs.' Mem. in Supp. of Mot. to Dismiss, at 25, the Supreme Court has held that "[t]he doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency."  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 644 n.3 (2002).  Defendants attempt to distinguish *Verizon Maryland* by arguing that "not all federal courts have confined the scope of that remark to the specific factual scenario addressed in that decision," citing an unpublished Central District of California case, *Reiner v. California Dep't of Indus. Relations.  See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 25. (citing No. 12-8649, 2012 WL 7145706, (C.D. Cal. Dec. 18, 2012), *report and recommendation adopted*, 2013 WL 571797 (C.D. Cal. Feb. 10, 2013), *aff'd sub nom. Reiner v. California*, 612 F. App'x 473 (9th Cir. 2015)).  In *Reiner*, the plaintiff sought review of determinations made in a state-level workers' compensation appeal board and "state tribunals." *See* 2012 WL 7145706, at *2.  In finding that the *Rooker–Feldman* doctrine applied, the Magistrate Judge emphasized that the case was based primarily on state law, not federal law as in *Verizon Maryland*, and that the party in *Reiner* had actually filed a state-level claim previously, unlike in *Verizon Maryland.  See id.* at *3.

Given that the *Rooker–Feldman* doctrine is "narrow and focused," *Thana v. Board of License Comm'rs*, 827 F.3d 314, 319 (4th Cir. 2016), the Court is not inclined to go against the black-letter of *Verizon Maryland* that "[t]he doctrine has no application to judicial review of

---

[8] Courts and scholars alike emphasize that the Supreme Court has trended toward narrowing the doctrine since *Feldman*, particularly in *Lance. See, e.g., Thana v. Board of License Comm'rs*, 827 F.3d 314, 319–20 (4th Cir. 2016) (calling the doctrine "narrow and focused"); Samuel Bray, *Rooker Feldman (1923–2006)*, 9 Green Bag 2d 317 (2006) (mock obituary of the doctrine).

executive action, including determinations made by a state administrative agency." 535 U.S. at 644 n.3. But even if it were, this is not a case of "primarily . . . state law," *Reiner*, 2012 WL 7145706, at *3, and, as noted above, the Zoning Commission could not have substantively heard these types of discrimination claims. This is a case of primarily federal law with the actions of a state administrative agency looming in the background; in no way is the current action an appeal of the Zoning Commission's order. Accordingly, *Rooker–Feldman* is inapplicable.

### 3. *Younger* Abstention

Defendants invoke the related doctrine of *Younger* abstention in support of their Motion to Dismiss. "In *Younger v. Harris* and its progeny, the Supreme Court held that, except in extraordinary circumstances, a federal court should not enjoin a pending state proceeding (including an administrative proceeding) that is judicial in nature and involves important state interests." *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1120 (D.C. Cir. 2004). The doctrine stems from the equitable principle that "courts . . . should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43–44 (1971). At its core, *Younger* abstention stems from concerns of comity and federalism and prevents federal courts from enjoining ongoing criminal prosecutions. *See id.*; *see also Samuels v. Mackell*, 401 U.S. 66, 73 (1971). Moving beyond the core of the doctrine, federal courts also abstain in quasi-criminal contexts. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (abstaining in a civil context because "the proceeding is both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials"). The periphery of the doctrine may encompass proceedings not in courts, but that are judicial in nature and concern important state interests. *See New Orleans Pub. Serv., Inc. v. Council of City of*

*New Orleans*, 491 U.S. 350, 364–73 (1989).  The doctrine has even been applied to suits between two non-state parties where the underlying dispute concerned important state interests. *See, e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 17 (1987).  In a case between private parties, federal courts must abstain when (1) the relief sought would enjoin an ongoing state proceeding, (2) the state proceeding is judicial in nature, (3) "the state proceedings implicate important state interests," and (4) "the proceedings afford an adequate opportunity to raise the federal claims." *See William Penn Apartments*, 39 F. Supp. at 19 (internal citations and quotations omitted).

The Court need not address all four requirements, because Defendants' argument fails to establish that the Zoning Commission proceedings "afford an adequate opportunity to raise the federal claims."  Defendants argue that a D.C. Federal District Court has said that "[t]he Board of Zoning Adjustment ha[s] authority to consider reasonable accommodation request[s]," implying that the board could consider such requests under the FHA.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 29.  In fact, that court suggested the opposite—although acknowledging that the Board of Zoning Adjustment has the power to make a reasonable accommodation *sua sponte* under the "functional equivalent" of the FHA under D.C. regulations, the court explicitly stated that "the [DC Department of Consumer and Regulatory Affairs] is the body to whom a request for reasonable accommodation is properly lodged in the first instance."  *See United States v. District of Columbia*, 538 F. Supp. 2d 211, 218 (D.D.C. 2008).  The court cited 14 D.C.M.R. § 111, which is entitled "Procedures Regarding Requests for Reasonable Accommodation Under the Fair Housing Act."  That regulation provides that "[a]ll requests for reasonable accommodation under the Fair Housing Act shall be submitted to the Director, Department of Consumer and Regulatory Affairs . . . or such office as the District may assign or delegate."  14 D.C.M.R. § 111.3.  Similarly, here, as noted above in the Court's discussion of

issue and claim preclusion, the Zoning Commission is not a body empowered to hear FHA

claims.  Thus, the Court will not abstain from addressing the merits of Plaintiffs' federal claims.

### 4.  ONE DC Standing

The Court next addresses Defendants' argument that ONE DC—the community

organization with some members who are residents of Brookland Manor with minor children, *see*

Compl. ¶¶ 108–09—lacks standing to bring this matter.  Defendants specifically argue that ONE

DC lacks a sufficiently concrete injury-in-fact.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at

31–35.  "The Supreme Court has held that standing to bring an FHA claim is coextensive with

constitutional standing."  *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp.

2d 46, 52 (D.D.C. 2002); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).

ONE DC "bears the burden of establishing" its standing.  *See Lujan*, 504 U.S. at 561. "An

organization can have standing on its own behalf . . . or on behalf of its members."  *Abigail All.*

*for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006)

(internal citations omitted).  Standing based on an organization's own injury—"organizational

standing"—requires an organization, "like an individual plaintiff, to show actual or threatened

injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a

favorable court decision."  *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C.

Cir. 2011) (internal quotations omitted).  For an organization to sue on behalf of its members

through "associational standing," it must show that (1) "its members would otherwise have

standing to sue in their own right," (2) "the interests it seeks to protect are germane to the

organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit."  *United Food & Commercial Workers Union*

*Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs assert that ONE DC has both organizational and associational standing. Because the Court finds that ONE DC has organizational standing, it need not address the associational standing issue.  As noted above, organizational standing requires a concrete injury, not "a mere setback to [the organization's] abstract social interests."  *See Equal Rights Ctr.*, 633 F.3d at 1138 (internal citations and quotations omitted).  "An organization's expenditure of resources on a lawsuit does not constitute an injury in fact sufficient to establish standing."  *Id.* However, it is "clear . . . that if the defendant's allegedly wrongful action prompts an organization to 'increase[] the resources [it] must devote to programs independent of its suit' . . . , the organization has shown an injury in fact."  *Id.* (alterations in original) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  There is "an important limitation" on this principle: if an injury is "self-inflicted as a result of the organization's own budgetary choices," the party cannot claim an injury-in-fact as a result of the defendant's behavior.  *Id.* at 1139 (internal quotations omitted).  This "does not automatically mean that [a party diverting resources] cannot suffer an injury sufficient to confer standing."  *Id.* at 1140.  The crucial test for determining whether an injury is self-inflicted is whether the party "undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation."  *Id.*  In the housing context, using resources for a program to counteract a defendant's discriminatory advertisement constitutes an adequate injury-in-fact, because it is used for the practical purpose of responding to allegedly illegal activity, not to prepare for litigation.  *See id.* (citing *Spann*, 899 F.2d at 27–29).  In *Spann v. Colonial Village, Inc.*, the plaintiff-organizations established standing when they alleged that the defendants'

"preferential advertising tended to steer black home buyers and renters away from the advertised complexes," requiring the plaintiffs to "devote more time, effort, and money to endeavors designed to educate not only home buyers and renters, but the DC area real estate industry." 899 F.2d at 27. So, if Defendants' alleged actions frustrated ONE DC's mission and ONE DC used resources to counteract that harm, it has standing to maintain the action. *See Equal Rights Ctr.*, 633 F.3d at 1140.

Based on the facts alleged in the Complaint, ONE DC has standing to maintain this action. ONE DC is "comprised of members who include tenants of affordable housing properties that are seeking to avoid displacement, preserve affordable housing, ensure fair housing, and further equitable development in D.C." Compl. ¶ 108. The alleged discrimination plainly frustrates ONE DC's mission. Plaintiffs allege that ONE DC has had to divert its scarce resources away from its central mission to "crisis organizing" in the form of investigation, counseling, organizing, canvassing, and other Brookland-specific programming. *See id.* ¶¶ 113–121. In all, Plaintiffs allege that, as of July 28, 2016, ONE DC has "diverted approximately 640 hours of its staff members' time to identify and combat Defendants' discriminatory conduct through outreach, organizing, advocacy, and tenant counseling efforts." *Id.* ¶ 121. This places ONE DC's case squarely within the holdings in *Equal Rights Center* and *Spann*. ONE DC did not spend 640 hours concocting an injury in anticipation of litigation, but instead did so for the practical purpose of combating alleged discrimination in the community. Defendants' alleged discrimination forced ONE DC to address an exigency in the community at the expense of its broader social goals. Accordingly, ONE DC has sufficiently alleged organizational standing to withstand Defendants' Motion to Dismiss.

5.  Failure to State Disparate Impact Claims

Defendants move to dismiss for failure to state a claim with respect to Plaintiffs'

disparate impact claims under the FHA and DCHRA.  Defendants argue that Plaintiff

erroneously assumes that "large families" are a protected group under the FHA, instead of the

broader protected class of "families."  Defendants further argue that without an FHA claim,

Plaintiff cannot invoke supplemental jurisdiction to maintain its DCHRA claim.  The Court will

address these arguments in turn.

*a.  Fair Housing Act*

Defendants move to dismiss Plaintiffs' FHA disparate impact claim for failure to state a

claim on the basis that Plaintiffs' statistical analysis cherry-picks "large families" from the

broader "familial status," and in so doing fails to analyze the effect that the *entire* redevelopment

plan would have on *all* families that reside or will reside in the new community.  *See* Defs.'

Mem. in Supp. of Mot. to Dismiss, at 11–12.

The Federal FHA prohibits "mak[ing] unavailable . . . a dwelling to any person because

of . . . familial status."  *See* 42 U.S.C. 3604(a).  "'Familial status' means one or more individuals

(who have not attained the age of 18 years) being domiciled with . . . a parent or another person

having legal custody of such . . . individuals," or the parent's designee.  42 U.S.C. 3602(k).  It is

important to note that the FHA is generally a repository of negative rights—it does not

affirmatively provide special privileges to parents living with minor children, but rather protects

them from discriminatory acts.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive*

*Communities Project, Inc.*, 135 S. Ct. 2507, 2522 (2015) ("The FHA is not an instrument to force

housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities

can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.").

For example, the FHA does not entitle families to occupy units in excess of nondiscriminatory, reasonable occupancy requirements that apply to the population in general.  *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights, Ohio*, 209 F.3d 626, 636 (6th Cir. 2000); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 733 (1995) (contrasting impermissible policies that target families with permissible policies that "apply uniformly to *all* residents of *all* dwelling units").  It is also important to emphasize that the FHA only protects minor children domiciled with parents (or other such persons in a guardian role, as provided by the statute).  As Plaintiffs concede, *see* Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss, at 8 n.4, ECF No. 21, the sub-class of "large families" is not a protected class under the FHA.  *Debolt v. Espy*, 832 F. Supp. 209, 215 (S.D. Ohio 1993), *aff'd*, 47 F.3d 777 (6th Cir. 1995) ("The Court notes that as opposed to families in general, 'large families' are not a specifically protected class under Title VIII."); *see also Fair Hous. Advocates Ass'n, Inc.*, 209 F.3d at 638 (concluding that "families of four, as opposed to families of three, are not protected classes").

"[D]isparate-impact claims are cognizable under the Fair Housing Act . . . ."  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518, 2525 (2015).  "To prevail on a disparate impact claim, a plaintiff must offer sufficient evidence to support a finding that the challenged policy *actually* disproportionately affected a protected class."  *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 681 (D.C. Cir. 2006).  The Secretary of Housing and Urban Development has "[t]he authority and responsibility for administering" the FHA.  42 U.S.C. § 3608(a); *see also Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016).  Part of that authority is the power to promulgate rules "to carry out" the FHA.  *See* 42 U.S.C. § 3614a; *see also Mhany Mgmt., Inc.*, 819 F.3d at 618.  Accordingly, in line with the Second Circuit in *Mhany Management*, the Court "must defer to

[HUD]'s reasonable interpretation" of the FHA with respect to its rules on disparate impact. *See* 819 F.3d at 618 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *accord Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016). HUD has adopted a burden-shifting framework for evaluating disparate impact claims. *See* 24 C.F.R. § 100.500(c). First, the plaintiff has "the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). Once the plaintiff makes such a showing, the "defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant." 24 C.F.R. § 100.500(c)(2). If the defendant is able to do so, the "plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3).

To make an initial showing of disparate impact at "step one," courts often rely on statistical analyses. *See, e.g.*, *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 124–25 (D.R.I. 2015); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 16–17 (D. Conn. 2011). Such an analysis requires a plaintiff to "compar[e] those affected by the policy with those unaffected by the policy." *See Gashi*, 801 F. Supp. 2d at 16 (citing *Tsombanidis v. West Haven Fire Dep*'t, 352 F.3d 565, 575–76 (2d Cir.2003)); *accord Graul*, 120 F. Supp. 3d at 124 (internal citation and quotations omitted). In the "context . . . [of] housing discrimination, a wide enough contrast between the way a policy burdens members of a protected group as opposed to non-members is cognizable as a disparate impact." *Graul*, 120 F. Supp. 3d at 125. In *Gashi*, the court found a 30.76% effect on households with children and a 9.88% effect on households without children sufficient to constitute a disparate impact. *See* 801

F. Supp. 2d at 16–17.  In *Graul*, the court found a threefold difference sufficient.  *See* 120 F.

Supp. 3d at 126.

Defendants move to dismiss on the grounds that Plaintiffs have not made a showing at

step one of HUD's framework, because, according to Defendants, Plaintiffs' statistical analysis

inappropriately focuses on a particular subset of the protected class—large families—and a

particular aspect of the redevelopment—the elimination of larger-occupancy apartments.  *See*

Defs.' Mem. in Supp. of Mot. to Dismiss, at 11–18.  The Court will address these two

contentions in turn.

i.   "Familial Status" vs. "Large Families"

Defendants' first qualm with Plaintiffs' reasoning is that it relies on discrimination

against large families rather than families as a protected group.  *See* Defs.' Mem. in Supp. of

Mot. to Dismiss, at 9.  As noted above, the FHA protects all families, as defined by statute,

regardless of size.  Courts have consistently assumed that "'[f]amilial status' refers to the

presence of minor children in the household."  *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246,

247 (9th Cir. 1997); *see also Graul*, 120 F. Supp. 3d at 125–26 (favorably citing methodology

comparing "households with children" and "households with no children"); *United States v.

Branella*, 972 F. Supp. 294, 298 (D.N.J. 1997) ("Specifically, the FHAA provides that it is

unlawful to make a dwelling unavailable to any prospective buyer or renter because of the

presence of minor children in the prospective household.").  So, although there is no special

treatment for "large families" under the FHA, they are still protected under the umbrella of

"families" if minors are in the household.

Although Plaintiffs do repeatedly refer to "large families" in their Complaint, their statistical analysis specifically concerns "those who have one or more minor children living in the household." *See* Compl. ¶¶ 72, 37. Similarly, Plaintiffs define their proposed class as "[a]ll households who reside or have resided at Brookland Manor in a three-, four- or five[-]bedroom unit with one or more minor child." *See id.* ¶ 122. Plaintiffs' statistical analysis includes apartments of all sizes, comparing those with minor children to those without them. *See id.* ¶ 75. Using that metric, Plaintiffs arrive at the conclusion that the proposed redevelopment would adversely affect 59% of families overall, compared to 15% of nonfamilies. *See id.* ¶ 77. It does not matter that many of the protected individuals are part of "large families" for the purpose of the Complaint, so long as the unprotected group and protected group are correctly defined. Because the Complaint shows that Plaintiffs do correctly define these groups, Plaintiffs did not "cherry-pick" protected families from the larger protected class.

ii.    The Elimination of Large Apartments vs. the Project as a Whole

Defendants also argue that Plaintiffs fail to take into account "*all* families that reside *or will reside* in the revitalized community," citing *Boykin v. Gray*. *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 11 (second emphasis added). In *Boykin*, a group of homeless men claimed that the District of Columbia's closure of a particular homeless shelter violated the FHA, because a disproportionate amount of the D.C. homeless population is black and Hispanic. *See* 986 F. Supp. 2d 14, 16 (D.D.C. 2013). The closure of the homeless shelter was part of a "broader shift in the District's policy toward its homeless citizens" that had a net-positive impact on the minority population in the District. *Id.* at 21. Applying a disparate-impact standard, that court found that "[t]he fundamental defect in the plaintiffs' argument is that the adverse impact of which they complain was suffered not by the entire homeless population in the District of

Columbia, nor even by a significant portion of its more than 6,000 members." *See id.* at 20. Closing the specific shelter affected 90 people, but the overall number of beds available to homeless persons rose as a result of the District's program. *See id.* at 20–21. By referring to "*its* homeless citizens," "the entire homeless population in the District of Columbia," and "*its* 6,000 members," the above excerpts show that the court was interested in the District of Columbia's overall universe of homeless persons.

In the context of a private landlord, courts are similarly concerned with the private party's universe of tenants. In *Betsey v. Turtle Creek Associates*, the tenants of a particular building contended that a policy would have a disparate racial impact on them as individuals. 736 F.2d 983, 985–87 (4th Cir. 1984). Because the plaintiffs did not show a "continuing disproportionate impact," a sufficient racial impact of the entire complex, or any impact on the local community, the district court dismissed the claim. *See id.* at 986–87. Reversing, the Fourth Circuit held that "members of a discrete minority[] are required to prove only that a given policy had a discriminatory impact on them as *individuals*." *Id.* at 987. That court found "consideration of the rest of the local community, the rest of [the residential community], or even prospective applicants for space in [the building] irrelevant." *See id.* (internal quotations omitted). "The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Id.*

Here, it does not matter that the redevelopment might open up space for families in the local community to occupy smaller apartments at the redeveloped project. Defendants' universe of persons are the existing tenants at Brookland Manor. If the current families of Brookland Manor are disparately impacted by the redevelopment, it is irrelevant that some protected persons in the local community might end up filling their shoes in units that could not support

them.  Plaintiffs do analyze the effect that the entire project will have on all existing tenants of

Brookland Manor.  *See* Compl. ¶¶ 75–79.  Given that Plaintiffs adequately allege that the

proposed redevelopment project will affect Brookland Manor families over three times as much

as it will nonfamilies, they state a claim.

### b. D.C. Human Rights Act

Defendants' only contention specific to the DCHRA is that "elimination of [Plaintiffs']

federal claims would dictate dismissal of the rest of their claims as failing the test for

supplemental jurisdiction."  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, at 18 n.7.  Even if

true, the Court simply notes that, as set forth above, it is not dismissing the federal-question

claims under the federal FHA, so supplemental jurisdiction remains.

## B.  Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs move for a preliminary injunction to prevent Defendants from proceeding with

their redevelopment plan.[9]  "To warrant preliminary injunctive relief, the moving party must

show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable

injury if the injunction were not granted, (3) that an injunction would not substantially injure

other interested parties, and (4) that the public interest would be furthered by the injunction."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  There

must be a showing of likely irreparable harm for a preliminary injunction to issue.  *Id.*; *see also*

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard

requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the

absence of an injunction.").  The D.C. Circuit "has set a high standard for irreparable injury,"

---

[9] *See supra* note 4 and accompanying text.

requiring that the injury "be both certain and great," and "actual and not theoretical."

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal citations and quotations omitted).

"The moving party must show '[t]he injury complained of is of such *imminence* that there is a

"clear and present" need for equitable relief to prevent irreparable harm.'"  *Id.* (alteration in

original) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  To

meet the standard, "the harm must be so imminent as to be irreparable if a court waits until the

end of trial to resolve the harm."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235

(2d Cir. 1999).  The moving party must also show that the threatened injury is "beyond

remediation" with other forms of relief.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at

297.

Plaintiffs argue that the threatened injuries are imminent, because when Defendants

receive Stage Two approval, they will be free to commence destruction of Plaintiffs' homes.  *See*

Pls.' Mem. in Supp. of Mot. for Prelim. Inj., at 26.  Specifically, they argue that "D.C. Municipal

Regulations make clear that second-stage approval is the final step before a redeveloper may

commence demolition."  *See id.*  They further argue that Defendants have already required

families who reside in large units to "relocate, break up, and downsize."  *See id.*  In support of

their assertion, Plaintiffs cite to several declarations of tenants who claim to know others at

Brookland Manor who have been forced to move.  *See id.* at 27; McFadden Decl. ¶ 6; Jenkins

Decl. ¶ 6; Scott Decl. ¶ 6.  However, they do not cite to any first-hand account of a family who

has been forced to relocate off the property, nor any family who has been told they will need to

relocate but will be unable to do so on the property.[10]

---

[10] Plaintiffs' argument that a recent submission to the Zoning Commission shows that the
first block to be demolished contains almost all three- and four-bedroom apartments is
unavailing.  *See* Pls.' Reply Mem. in Supp. of Mot. for a Prelim. Inj., at 13, ECF No. 20.  If, as

Defendants argue that any displacement would not occur until years in the future.  *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj., at 6.  Michael Meers, Vice President of Defendant Mid-City Financial Corporation, has stated that demolition will not commence until late 2017, at the earliest, because of the length of time it takes to receive Stage Two approval and then obtain the requisite permits to begin the project.  *See* Meers Aff. ¶ 17.  Moreover, because the existing buildings are collateral on a HUD loan until August 1, 2017, it is "highly unlikely" that Defendants could begin demolition any earlier.[11]  *See id.* ¶ 21.  Even then, the project will be limited to "Phase One," meaning that only three of the 19 buildings will be demolished.  *See id.* ¶ 17.  Later phases will not begin until 2019, and neither individual Plaintiff will need to vacate until 2020, at the earliest.  *See id.* ¶¶ 17–19.  When the buildings are demolished during Phase One, Michael Meers asserts that all residents in those buildings will be "relocated at owner expense to an appropriate apartment home *on the property*."  *See id.* ¶ 17 (emphasis added).  Mr. Meers further declares that, although some tenants have been moved, none have been unable to relocate at Brookland Manor.  *See id.*  Citing to HUD guidelines and the D.C. Office of Planning's finding that the D.C. Zoning Commission cited favorably, Defendants' own numbers

---

they argue, Defendants have already relocated "the overwhelming majority of [that block's] residents," *id.* at 12 they should be even more capable of providing the Court with something in the record to show that a family has been relocated and unable to move into another apartment on the property.  If anything, this supports Defendants' argument that all families who will be relocated from Block 7 will be able to relocate on the property.  But even more to the point, the submission that Plaintiffs reference refers specifically to Block 7.  *See* Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj. Ex. 3, at 1, ECF No. 20-3.  The D.C. Zoning Commission knew that Block 7 was going to be demolished during Phase One, yet still credited a report that the larger units would not be phased out until the later stages of redevelopment.  *See Mid-City Fin. Corp.*, Z.C. Case 14-18, at 38, 50.

[11] For the same reasons noted in note 10, Plaintiffs' arguments about relocation occurring well in advance of demolition are unavailing.  *See* Pls.' Reply Mem. in Supp. of Mot. for a Prelim. Inj., at 13.  Although it is obviously true that relocation must occur before demolition, this fact, if anything, shows that Defendants are capable of relocating tenants to other locations on the property.

show that only 13 Brookland Manor households would currently require a four-bedroom

apartment, and none would require a five-bedroom apartment.[12]  *See Mid-City Fin. Corp.*, Z.C.

Case 14-18, at 38.  The same finding from the D.C. Office of Planning noted that "[t]he building

with the larger units would remain on the site until the later phases at which time they can be

'right sized' to accommodate the larger families."  *Id.*

 Plaintiffs have failed to demonstrate that any families—let alone a disproportionate

number of them—are facing the imminent threat of being forced to relocate until well after the

case can be fully adjudicated.  Plaintiffs do not, for example, point to a particular family that

lives in the block of houses scheduled to be demolished during Phase One that would be unable

to move into an apartment elsewhere at Brookland Manor.  Although Plaintiffs cite to certain

second-hand sources alluding to the idea of relocation, *see, e.g.*, Jenkins Decl., Defendants cite to

specific attributes of the redevelopment project showing otherwise.  The Vice President of Mid-

City has stated that it is "highly unlikely" that Phase One could begin until August, 2017, and

that it would be much more likely to begin later in 2017.  And, assuring the Court that the harm

is not imminent even further into the future, he states that no resident will be forced to move

away from Brookland Manor during Stage One, leaving the Plaintiffs with no ground to stand on

until Stage Two, which is at least three years away.  This makes sense in the context of

Defendants' contention that many families are in apartments that are too large, that the building

with larger units will remain until later phases of redevelopment, and that vacancies currently

exist that can be used to house displaced households from Block 7.[13]  The situations of individual

---

 [12] Plaintiffs are correct that D.C. occupancy law may make this number higher in certain cases.  However, they do not tell the Court how frequently this is the case, or otherwise carry their burden of showing the extent of the issues in light of Defendants' evidence.

 [13] It is worth noting that although Plaintiffs' methodology is plausible for HUD's "step one" showing of disparate impact at the motion-to-dismiss stage, it comes up short in showing

Plaintiffs give the Court further assurance: there are no plans that would require Ms. Borum to relocate until 2020 at the earliest or Ms. Holloman until 2023.  Even if the proposed class were certified here, vague stories and misgivings from tenants are insufficient for Plaintiffs to shoulder their burden of showing that an irreparable injury will likely occur if the Court waits to adjudicate the dispute on the merits.  Although it is certainly *possible* that Defendants' plans could change by moving the process up considerably, Plaintiffs have not met the "high standard" of showing that they imminently face their alleged injuries.  The chance that the timeline moves up, disparate impact will occur at Phase One, or Plaintiffs will otherwise suffer injury does not rise to the level of a "clear and present threat" necessary for a showing of irreparable injury.  Because some showing of imminent irreparable injury is required for the issuance of a preliminary injunction, the Court must deny Plaintiffs' motion.

If Plaintiffs do obtain evidence showing that imminent injury is likely to occur, the Motion can be renewed and will be reconsidered in light of such new evidence.  And, because Defendants applied for Stage Two PUD approval ahead of schedule and stop short of guaranteeing that they will follow the timeline set forth in their declarations, the Court will impose on Defendants a requirement to report to the Court and Plaintiffs any changes in schedule

---

that "families"—as defined by the FHA—will necessarily be forced to relocate away from the property at a disproportionate rate during the later stages of redevelopment.  As noted above and shown by a plain reading of the statutory text, the FHA protects *only* minor children living with parents (or similar guardians).  *See* 42 U.S.C. § 3602(k).  The definition of "family" does not, for example, "encompass groups of more than one family."  *Doe v. City of Butler*, 892 F.2d 315, 326 (3d Cir. 1989) (Roth, J., dissenting).  Thus, a group of people cannot talismanically receive protection under the FHA just because one of them happens to be a parent domiciled with a minor child.  Although the Court need not reach the issue given the lack of imminent irreparable injury, in light of the fact that all tenants will eventually have to relocate to different units on the property, *see Mid-City Fin. Corp.*, Z.C. Case 14-18, at 2 (noting that all the existing buildings will be replaced), the Court queries whether breaking up groups of people—including extended families—into separate apartments will necessarily disparately impact "families."

that might make displacement of tenants at Brookland Manor more imminent than it was when

they made their declarations in opposition to Plaintiffs' Motion for a Preliminary Injunction.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED** and Plaintiffs'

Motion for a Preliminary Injunction is **DENIED**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.

Dated:  November 21, 2016                                        RUDOLPH CONTRERAS
                                                                              United States District Judge