# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
| ADRIANN BORUM, *et al.*, | : | Civil Action No.: | 16-1723 (RC) |
| | : | | |
| Plaintiffs, | : | Re Document Nos.: | 141, 143, 145, |
| | : | | 146, 147, 148, |
| | : | | 149, 150, 165, |
| v. | : | | 166, 170, 175, |
| | : | | 177 |
| | : | | |
| | : | | |
| BRENTWOOD VILLAGE, LLC, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART
PLAINTIFFS' MOTION FOR VOLUNTARY DISMISSAL; GRANTING DEFENDANTS' MOTIONS TO
FILE UNDER SEAL; GRANTING PLAINTIFFS' MOTIONS TO FILE UNDER SEAL; DENYING AS
MOOT DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY; DENYING AS MOOT
DEFENDANTS' MOTION FOR EXTENSION OF TIME

## I. INTRODUCTION

This long-running class action litigation pits a class of current residents of a housing

development in the Northeast quadrant of Washington, D.C., against the companies seeking to

redevelop the apartment complex. Plaintiffs allege that Defendants' planned redevelopment will

disparately impact families, in violation of both the Fair Housing Act ("FHA"), 42 U.S.C. §§

3601–19 (2018), and the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401 to 2-1404

(2020), and further contend that Defendants made actionably discriminatory statements against

families that contravene these same two statutes.[1] After nearly two years of discovery,

---

[1] The Court previously approved class representative Marita Moore to pursue Plaintiffs'
disparate impact claims. *See Borum v. Brentwood Vill., LLC* (*Borum IV*), No. CV 16-1723, 2019
WL 2437686 at *1 (D.D.C. June 11, 2019). The certified class is joined by the organizational

Defendants have moved for summary judgment. As set forth below, because Plaintiffs have provided no evidence of a discriminatory disparate impact on the basis of "familial status," as defined by the controlling statutes, the Court grants Defendants' motion for summary judgment on Plaintiffs' disparate impact claims. Moreover, because Plaintiff ONE DC has not established standing to pursue the discriminatory statement claim, the court grants Defendants' motion for summary judgment on that claim, too.

## II. BACKGROUND

### A. Procedural History

This Court's earlier opinions in this case have detailed the facts underlying Plaintiffs' class claims. *See Borum v. Brentwood Village, LLC* (*Borum I*), 218 F. Supp. 2d 1 (D.D.C. 2016); *Borum v. Brentwood Village, LLC* (*Borum II*). 324 F.R.D. 1 (D.D.C. 2018); *Borum v. Brentwood Assocs., L.P.* (*Borum III*), 329 F.R.D. 90 (D.D.C. 2019), *Borum IV*, 2019 WL 2437686; *Borum v. Brentwood Vill., LLC* (*Borum V*), 332 F.R.D. 38 (D.D.C. 2019). The Court assumes familiarity with these dispositions and briefly reviews portions of the procedural history to contextualize the pending motion for summary judgment.

On August 25, 2016, original plaintiffs Adriann Borum, Loretta Holloman, and ONE DC filed suit against defendants Brentwood Village, LLC, Mid-City Financial Corporation, and Edgewood Management Corporation alleging disparate impact discrimination and discriminatory statements in violation of the FHA and DCHRA. *Borum IV*, 2019 WL 2437686, at *1.[2]

---

plaintiff ONE DC, which, as the Court addresses *infra* Section IV.B, also separately pursues a discriminatory statement cause of action. The Court's references to "Plaintiffs" should be taken to refer to both the class and to ONE DC, unless otherwise specified.

[2] Although *Borum IV* cites to the original complaint, Plaintiffs have since filed an amended complaint. "Once an amended pleading is interposed, the original pleading no longer performs any function in the case." 6 Charles A. Wright, Arthur R. Miller & Mary Kane, *Federal Practice and Procedure* § 1476 (3d ed. 2019); *see Pinson v. DOJ*, 69 F. Supp. 3d

Plaintiffs initially alleged that the proposed redevelopment of the Brookland Manor apartment complex would reduce the number of three-bedroom apartments and eliminate four- and five-bedroom apartments in a way that discriminated against families. *Borum IV*, 2019 WL 2437686, at *1; *see also* Am. Compl. ¶¶ 1–10, ECF No. 139. Plaintiffs also alleged that Defendants had made statements that discriminated against families. *Borum IV*, 2019 WL 2437686, at *1; *see also* Am. Compl. ¶¶ 163–78. On Plaintiffs' motion, this Court certified the following class of Brookland Manor plaintiffs to pursue both sets of claims under the FHA and DCHRA, respectively:

> All individuals who reside at Brookland Manor in a three-, four-, or five-bedroom unit that houses one or more minor child and his or her guardian, and are at risk of being displaced from a three-, four-, or five-bedroom unit at Brookland Manor as a direct result of the proposed redevelopment.

*Borum IV*, 2019 WL 2437686 at *2 (quoting *Borum II*, 324 F.R.D. at 20). Thereafter, Defendants moved to decertify the class, contending that the named representative, Ms. Borum,[3] could no longer adequately represent the interests of the class because she had been issued a notice to vacate and faced possible eviction. *Id.* at *2 (discussing *Borum III*, 329 F.R.D. at 92–93). The Court agreed that these developments with Ms. Borum created a conflict and made her an inadequate class representative, yet declined to decertify the class and instead granted

---

108, 113 (D.D.C. 2014) (citing *Owens v. Republic of Sudan,* 412 F. Supp. 2d 99, 117 (D.D.C. 2006), *aff'd and remanded on other grounds,* 531 F.3d 884 (D.C. Cir. 2008). Thus, the Court considers only the facts and allegations as stated in the amended complaint.

The Court notes that the operative, amended complaint includes individual claims by Ms. Borum and Ms. Moore. The Court addresses Plaintiffs' motion to dismiss (1) all claims brought on behalf of Ms. Borum in her individual capacity and (2) Ms. Moore's discriminatory statement claims *infra* Part IV. *See* Plaintiffs Adriann Borum and Marita Moore's Motion for Voluntary Dismissal ("Pls.' Mot. Volun. Dismissal"), ECF No. 177.

[3] Ms. Holloway independently dropped her claim, making Ms. Borum the sole named representative at the time that the motion to decertify the class was filed. *See Borum IV*, 2019 WL 2437686, at *2 (noting voluntary dismissal of claim).

Plaintiffs the opportunity to substitute another representative. *Id.* (citing *Borum III*, 329 F.R.D. at 100–01).

On February 6, 2019, Plaintiffs moved to substitute Marita Moore as the class representative. *Id.* This Court approved Ms. Moore to represent the class's disparate impact claim and decertified the class with respect to Plaintiffs' discriminatory statements claim. *Id.* at *12. Thus, only the individual named plaintiffs and organizational plaintiff ONE DC continued to press the discriminatory statements claim. *Id.* Plaintiffs then filed an amended class action complaint, *see* Am. Compl., ECF No. 139, and the parties completed discovery. Contending that Plaintiffs have not established any viable claim for relief, Defendants now move for summary judgment on all claims.

## B. Plaintiffs' Disparate Impact Claim[4]

In their discriminatory disparate impact claim, Plaintiffs contest Defendants' plan to redevelop the approximately 465 apartment units that residents presently occupy at Brookland Manor. Pls.' Response to Defs.' SUMF 3. This apartment complex, located in Ward 5, Northeast, in Washington, D.C., *id.*; *see also id.* at 52, was home to 193 households with minor children as of February 12, 2018, *id.* at 52. Many of these households include larger families, most of whom reside in three-, four-, and five-bedroom apartment flats. *Id.* at 52. Defendants' initial application to the D.C. Zoning Commission indicated plans to replace the existing

---

[4] On a motion for summary judgment, the Court accepts the non-movant's evidence—here, Plaintiffs'—as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Unless otherwise indicated, the reporting of the facts here and throughout the Court's opinion draws from portions of Defendants' statement of undisputed material facts that Plaintiffs have indicated are not in dispute or evidence that Plaintiffs have put forth to be tried. *See generally* Am. Compl.; Pls.' Combined (1) Response to Defs.' Statement of Undisputed Material Facts and (2) Statement of Genuine Issues to be Tried ("Pls.' Response to Defs.' SUMF"), ECF No. 165-3.

apartment structures with approximately 1,646 to 2,200 new residential units. *Id.* at 54. The

final Zoning Commission Order reflected plans to construct 1,646 new units, *id.* at 96–97 (citing

Zoning Commission Order ¶ 52, ECF No. 141-4), without any stated plans to construct four- or

five-bedroom apartments at the redeveloped Brookland Manor, *id.* at 55.[5] Plaintiffs also state

that Defendants proposed reducing the number of three-bedroom units, *id.* at 55, a charge that

Defendants contest on the basis that they never specified the maximum number of three-bedroom

units that would be constructed, Defs.' SMF 98 ("Defendants . . . committed to the Zoning

Commission on April 10, 2015 to build at least 64 three[-]bedroom units." (emphasis removed)).

The final unit mix for the community remains undetermined. Pls.' Response to Defs.' SUMF 8.

Notwithstanding the fact that the unit mix could change, Plaintiffs urge that the initially proposed

changes in unit size, and especially the elimination of four- and five-bedroom flats, will

disparately impact the large families who have made Brookland Manor home. *See id.* at 40, 44–

45, 52. Plaintiffs' references to "families" invoke families in the colloquial sense, as opposed to

tracking "familial status" as defined by the FHA and DCHRA.[6] Thus, Plaintiffs discuss families

as households with minor children, *id.* at 45, potentially including multiple generations under the

same roof, *id.* at 53–54 (suggesting benefits where multigenerational families reside together).[7]

---

[5] As Defendants mention many times in their motion for summary judgment and filings in support thereof, Defendants "have committed to accommodating all current residents . . . and constructing four- and five-bedroom apartment flats if those flats are needed to meet that commitment." Defs.' Reply to Pls.' Combined (1) Response to Defs.' Statement of Undisputed Material Facts and (2) Statement of Genuine Issues to be Tried ("Defs.' SMF") 97, ECF No. 175-3 (citing ECF No. 141-9; ECF No. 141-5; ECF No. 141-36). This abstract commitment does not change the fact that there is no binding requirement to construct any such units, nor does it alter the fact that none of the redevelopment plans state that any such units will be constructed unless it expressly proves necessary.

[6] The Court addresses this issue in detail *infra* Section IV.A.1.

[7] The Court notes that Defendants have moved to exclude the expert testimony from which these suggestions are derived as irrelevant and unreliable. *See* Defs.' SMF 94 (citing Defs.' Mot. to Exclude Lance Freeman's Expert Test., ECF No. 148). The Court mentions this

## C.  Plaintiffs' Discriminatory Statements Claim

Plaintiffs also bring discriminatory statements claims based on certain statements that Defendants made about the planned community while obtaining approval from the D.C. Zoning Commission and while communicating with the residents of Brookland Manor.  First, Defendant Mid-City[8] told the Zoning Commission that it "does not propose to construct four[-] or five[-] bedroom units" because "housing very large families in apartment complexes is significantly impactful upon the quality of life of households as well as their surrounding neighbors."  Pls.' Response to Defs.' SUMF 55–56 (quoting Apr. 10, 2015 Letter to D.C. Zoning Commission ("Apr. 10, 2015 Letter") 6, ECF No. 4-13).  This same letter, as Defendants note, indicated elsewhere that Mid-City was "committed to allow all households that reside at Brookland Manor at the commencement of the redevelopment in early 2018 with the right to return to the new Brentwood Village community."  Defs.' SMF 100 (quoting Apr. 10, 2015 Letter 4).

Similar statements were also made in two communications with residents.  In November 2014, Defendant Mid-City informed the Brookland Manor/Brentwood Village Residents Association ("BM/BV RA") that it did not propose constructing four- or five-bedroom units because its "practical experience has demonstrated that it is not an ideal housing type for larger families and there are adverse impacts on the remainder of the community."  Nov. 19, 2014 Letter to BM/BV RA ("Nov. 19, 2014 Letter") 8, ECF No. 4-19.[9]  This same letter, as Defendants emphasize, also stated that Defendants' "objective will be to assist large families that

---

point here only to indicate the manner in which Plaintiffs define a "family" and discusses this issue more *infra* Section IV.A.1.

[8] Defendant Mid-City Financial Corporation owns Brookland Manor Apartments.  *See* Pls.' Response to Defs.' SUMF 1–2.

[9] Because this document includes both a paginated letter and an unpaginated enclosure, the Court uses the ECF page numbers to refer to the document.

currently reside in four and five bedroom apartments by preparing them for homeownership opportunities in the new townhomes," and that the "renewed community" would be "family friendly." Defs.' SMF 141–42 (quoting Nov. 19, 2014 Letter 3, 7). Later, in a letter written directly to residents of Brookland Manor, Defendant Mid-City stated that the "new community will not include new 4BR and 5BR apartment units as these large units are not consistent with the creation of a vibrant new community." *Id.* at 141 (quoting Jan. 20, 2015 Letter to Brookland Manor Residents ("Jan. 20, 2015 Letter") 1, ECF No. 4-20). Defendants again emphasize that this letter reiterated a commitment to assist residents by "work[ing] through their personal objectives and options[,] which may include housing qualified multi-generational families in two units, down-sizing into a 3BR unit, or being provided the opportunity to acquire one of the 'for sale' townhomes." *Id.* at 142 (quoting Jan. 20, 2015 Letter 1–2). No other specific statements by Defendants are described in Plaintiffs' filings.

### III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment" if, "after adequate time for discovery and upon motion," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Such a "complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial," and the movant is therefore entitled to summary "judgment as a matter of law." *Id.* at 323 (quoting *Anderson*, 477 U.S. at 250).

More generally, summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary. *See Celotex*, 477 U.S. at 323–24. The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1). In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

The Court first considers Plaintiffs' disparate impact claim and then addresses Plaintiffs' discriminatory statements claim. For the reasons set forth below, Plaintiffs cannot survive Defendants' motion for summary judgment on either claim.

## A. Discriminatory Disparate Impact Claim

To situate the central arguments that both parties make, the Court will first provide a brief overview of the relevant statutory provisions and then address the specific points at issue here.[10]

### 1. Statutory Protections for Families

As mentioned previously, Plaintiffs bring their disparate claim pursuant to two statutes: the FHA, 42 U.S.C. § 3601–19, and the DCHRA, D.C. Code §§ 2–1401 to 2–1404. The FHA was enacted in 1968 to combat "the denial of housing opportunities on the basis of 'race, color, religion, or national origin," and—as relevant here—was amended in 1988 to include "'familial status' as a protected characteristic." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.* (*Inclusive Communities*), 135 S. Ct. 2507, 2516 (2015) (first quoting Civil Rights Act of 1968, § 804, Pub. L. 90–284, 82 Stat. 83 (1968) (codified at 42 U.S.C. § 3604 (2018)), then citing Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988) (codified at 42 U.S.C. § 3602 (2018)); *see* 42 U.S.C. § 3604 (2018) (prohibiting discrimination on the basis of "race, color, religion, sex, familial status, or national origin"). This 1988 addition aimed to "protect against familial status discrimination in light of an express concern for the plight of single-parent families, young families with children, and poor families."

---

[10] Although Defendants' arguments concerning this claim contest ONE DC's standing, for the following reasons, the Court does not discuss standing here. This disparate impact claim was originally pursued by the class, by Ms. Borum in her individual capacity, and by organizational plaintiff ONE DC. *See generally* Am. Compl. This Court previously found that Ms. Moore may serve as the class representative for the class with respect to the disparate impact claim, *see Borum IV*, 2019 WL 2437686, such that the certified class has standing to pursue this claim. "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (citing *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009)). Thus, the Court need not consider ONE DC's standing to assert any of its claims, *see* Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mot.") 47, ECF No. 143-16, to resolve Defendants' motion for summary judgment on Plaintiffs' disparate impact claim. The Court separately addresses ONE DC's standing with respect to Plaintiffs' discriminatory statements claim, for which ONE DC is the sole claimant, *infra* Section IV.B.

*Borum II*, 324 F.R.D. at 12 (quoting *United States v. Branella*, 972 F. Supp. 294, 297 (D.N.J. 1997) (internal quotation marks omitted)).  The 1988 amendment defines familial status as:

> [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with[:] (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

42 U.S.C. § 3602(k) (2018).

The DCHRA provides similar protections and aims to "secure an end in the District of Columbia to discrimination for any reason other than individual merit, including, but not limited to, discrimination by reason of race, color, . . . [or] familial status."  D.C. Code § 2-1401.01.

Under the DCHRA, "familial status" is defined as:

> [O]ne or more individuals under 18 years of age being domiciled with: (1) a parent or other person having legal custody of the individual; or (2) the designee, with written authorization of the parent, or other persons having legal custody of individuals under 18 years of age.

*Id.* at § 2-1401.02.11A.  Thus, the definition of "familial status" under the FHA and DCHRA is identical for all purposes relevant to the pending suit.

Disparate impact claims alleging a discriminatory impact on a protected class, such as familial status, are cognizable under the FHA, *see Inclusive Communities*, 135 S. Ct. at 2525, and recognized under the DCHRA.[11]  Prevailing on a claim of discriminatory disparate impact

---

[11] The DCHRA's "effects clause" provides that "'[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."  D.C. Code § 2-1402.68.  Moreover, "[t]he D.C. Court of Appeals has held that this 'effects clause' imports into the Act 'the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*'" *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 685 (D.C. Cir. 2006) (quoting *Gay Rights Coal. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987)).  Because *Inclusive Communities* specifically noted that "[t]he logic of *Griggs* . . .  provides strong support for the conclusion that the FHA encompasses disparate-impact claims," 135 S. Ct. at 2511, and because neither party argues that the analysis under the FHA should depart from the analysis under the DCHRA, the Court

on a protected class such as "familial status" requires a plaintiff to "offer sufficient evidence to support a finding that the challenged policy *actually* disproportionately affected a protected class." *2922 Sherman Ave. Tenants' Ass'n*, 444 F.3d at 681 (emphasis in original). The Department of Housing and Urban Development ("HUD") has promulgated regulations to carry out its statutory "authority and responsibility for administering" the FHA. *See* 42 U.S.C. §§ 3608(a), 3614a (2018); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016). In resolving the pending motion, "the Court 'must defer to [HUD]'s reasonable interpretation' of the FHA with respect to its rules on disparate impact." *Borum I*, 218 F. Supp. 3d at 21 (quoting *Mhany Management*, 819 F.3d at 618) (citing *Boykin v. Fenty*, 650 Fed. Appx. 42, 44 (D.C. Cir. 2016) (expressing approval of *Mhany Management*)). HUD has set out a well-established burden-shifting framework to apply to disparate impact claims.[12] *See* 24 C.F.R. § 100.500(c). At the first step, the plaintiff has the "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* § 100.500(c)(1). If the plaintiff makes such a showing, then the burden shifts to the defendant, who must "prov[e] that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Thereafter, even if the defendant carries this burden, the "plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the

---

assumes *arguendo* that the disparate impact cause of action under these two statutes is identical and discusses them together.

[12] On August 19, 2019, HUD issued a proposed rule intended to, if adopted, "amend HUD's interpretation of the Fair Housing Act's disparate impact standard to better reflect the Supreme Court's 2015 ruling in [*Inclusive Communities*]." HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42854 (proposed Aug. 19, 2019) (to be codified at 24 C.F.R. pt. 100). Because no final rule has been issued, the Court discusses and applies the operative final rule that HUD promulgated in 2013.

challenged practice could be served by another practice that has a less discriminatory effect." *Id.* at § 100.500(c)(3).

As is the case here, disparate impact plaintiffs often rely on statistical analyses to discharge their step one burden. *Borum I*, 218 F. Supp. 3d at 22 (citing *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 124–25 (D.R.I. 2015); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 16–17 (D. Conn. 2011)). In attempting to meet this burden, "[a] plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection [between a defendant's challenged policy and the asserted discriminatory disparate impact] cannot make out a prima facie case of disparate impact." *Inclusive Communities*, 135 S. Ct. at 2523; *see also Boykin*, 650 F. App'x at 45 (quoting *Inclusive Communities*, 135 S. Ct. at 2523). The Court next considers whether Plaintiffs have carried their burden at step one or whether, as Defendants contend, their claim falters at this threshold stage. For the following reasons, Defendants have the better argument.[13]

### 2. Plaintiffs' Allegations of Disparate Impact on Families[14]

The statutory definition of what does and does not make up a "family" (and accordingly, what does and does not represent disparate impact based on familial status) lies at the heart of the

---

[13] Because the Court reaches this conclusion, it does not address the parties' arguments concerning subsequent steps of the disparate impact burden-shifting framework.

[14] The amended complaint included both the certified class's disparate impact claims and disparate impact claims that Ms. Borum brought on her own behalf. Am. Compl. ¶ 1. Plaintiffs have moved pursuant to Federal Rule of Civil Procedure 41(a)(2) to voluntarily dismiss with prejudice all claims that Ms. Borum pursued in her individual capacity. Pls.' Mot. Volun. Dismissal 1. Defendants agree that the Court should dismiss these claims with prejudice, though they contest Plaintiffs' request for fees and costs. Defendants' Mem. Part. Opp'n to Pls. Adriann Borum and Marita Moore's Mot. for Voluntary Dismissal ("Defs.' Mem. Part. Opp'n") 1, ECF No. 178.
    Rule 41(a)(2) permits dismissal of an action by court order "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). "Federal courts generally grant dismissals under Rule 41(a)(2) 'unless the defendant would suffer prejudice other than the prospect of a

parties' dispute. Defendants contend, as they have from the onset of this litigation, that

Plaintiffs' claims fail for a simple reason: Plaintiffs have not provided evidence of any disparate

impact based on "familial status" in the manner that the FHA and the DCHRA demand. Defs.'

Mot. 26 ("When the law is properly applied to the undisputed facts, Plaintiffs cannot demonstrate

that the redevelopment will have a disparate impact on families."). Plaintiffs rebut that this

understanding reflects an improperly restrictive definition of a "family." Pls.' Corrected Mem.

P. & A. in Opp'n. to Defs.' Mot. for Summ. J ("Pls.' Opp'n") 21, ECF No. 170-3 ("The FHA's

definition of 'family' is broader than Defendants purport it to be."). According to Plaintiffs, it is

a mistake to read the statutory definition of "familial status" in terms of a parent (or legal

custodian or designee) and associated minor in a way that excludes an intergenerational family.

*Id.* Rather, "[a] family consisting of a parent, a child, and a grandparent still qualifies as a

'family' under this definition." *Id.* Thus, Plaintiffs argue that breaking up an intergenerational

family "harms the immediate family" in a way that is "actionable under the FHA." *Id.*

Without expressing an opinion on Plaintiffs' argument as a policy matter, the Court

begins by turning to the relevant law. In *Borum I*, 218 F. Supp. 3d 1, this Court considered

similar points made by the parties in the context of addressing Defendants' opposition to

---

second lawsuit or some tactical disadvantage.'" *Allen v. Mnuchin*, No. CV 18-1214, 2019 WL
2581323, at *5 (D.D.C. June 24, 2019) (quoting *Robinson v. England*, 216 F.R.D. 17, 18 (D.D.C.
2003); *see also Conafay v. Wyeth Labs.*, 793 F.2d 350, 353 (D.C. Cir. 1986); 9 Charles A.
Wright, Arthur R. Miller, *Federal Practice and Procedure* § 2364 (3d ed. 2019). Here, because
Defendants move for summary judgment on this same claim, there is no evidence that dismissal
of Ms. Borum, standing alone, would prejudice Defendants. To be sure, Plaintiffs' motion for
voluntary dismissal mentions certain fee disputes between the parties, *see* Pls.' Mot. Volun.
Dismissal 1, which Defendants argue would result in prejudice to Defendants, *see* Defs.' Mem.
Part. Opp'n 4. The Court will consider any motions for fees and costs concerning these plaintiffs
if any shall be filed. At present, the Court finds it proper to dismiss Ms. Borum's disparate
impact claims, and, accordingly, grants in part Plaintiffs' motion with respect to this dismissal
while expressing no opinion concerning fees and costs. The Court thus considers only the
certified class's disparate impact claims in the following analysis.

Plaintiffs' motion for a preliminary injunction.  As the Court explained therein, the structure of

the FHA and controlling precedent concerning its provisions bear heavily on resolution of this

suit:

> It is important to note that the FHA is generally a repository of negative rights—it does not affirmatively provide special privileges to parents living with minor children, but rather protects them from discriminatory acts.  For example, the FHA does not entitle families to occupy units in excess of nondiscriminatory, reasonable occupancy requirements that apply to the population in general.

*Borum I*, 218 F. Supp. 3d at 21 (first citing *Inclusive Communities*, 135 S. Ct. at 2522, then citing *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights, Ohio*, 209 F.3d 626, 636 (6th Cir. 2000); *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 733 (1995)).

With this background point in mind, this Court previously expressed skepticism

regarding Plaintiffs' ability to demonstrate the requisite disparate impact on families, as that term

is defined by the FHA.  Although the Court found Plaintiffs' theory plausible to survive the

motion-to-dismiss stage, it cautioned that the methodology that Plaintiffs used to allege a

disparate impact on families "comes up short in showing that 'families'—as defined by the

FHA—will necessarily be forced to relocate away from the property at a disproportionate rate."

*Borum I*, 218 F. Supp. 3d at 26 n.13.  As the Court emphasized, a plain reading of the FHA

indicates that the statute protects *only* minor children living with parents (or similar guardians).

*Id.* (citing 42 U.S.C. § 3602(k)).  The definition of "family" does not, for example, "encompass

groups of more than one family."  *Id.* (first citing 42 U.S.C. § 3602(k), then quoting *Doe v. City

of Butler*, 892 F.2d 315, 326 (3d Cir. 1989) (Roth, J., dissenting)).  "Thus, a group of people

cannot talismanically receive protection under the FHA just because one of them happens to be a

parent domiciled with a minor child."  *Id.*

At this later stage of litigation, this Court holds Plaintiffs to a higher standard that the

evidence Plaintiffs provide does not clear.  The fundamental issue is fairly straightforward:

despite pages and pages of briefings, Plaintiffs never offer any statistical analysis or other

evidence that indicates how the proposed development will disparately impact families when family is construed in terms of the protected class defined by the FHA (e.g., in terms of familial status). Instead, as indicated above, Plaintiffs' evidence relies on a definition of a family that diverges from the FHA's definition of familial status. Specifically, the definition of a family that Plaintiffs use to allege disparate impact is "families with minor children who reside in three-, four-, and five-bedroom units," as compared to non-families who reside in the same type of housing." Pls.' Opp'n 22; *see also id.* ("Dr. Beveridge identified families (in various configurations with respect to adult household members, but with the presence of at least one or more minor children) as the protected group affected by the neutral policy—Defendant's redevelopment plan[.]"). This definition thus counts, in calculating who is part of a particular family, individuals who cannot claim "familial status" under the FHA (which, again, is restricted to minor children residing with a parent or other designated individual with legal custody).

Plaintiffs' reliance on this broader, non-FHA definition of a family dooms their argument. On the record before the Court, Plaintiffs' statistical evidence of disparate impact only uses this broader definition. *See id.*; Defs.' Mem. P. & A. in Supp. of Mot. for Summ. J. ("Defs.' Mot.") 36, ECF No. 143-16 (noting that Defendants' expert used statutory definition of "familial status" in calculations and contrasting to Plaintiffs' analysis); Defs.' Reply in Supp. of Mot. Summ. J. ("Defs.' Reply") 9, ECF No. 175-1 ("Plaintiffs' disparate impact analysis . . . use[s] a broader definition of families."). And because Plaintiffs' definition does not require a direct connection between parent (or legal guardian) and a minor child to establish familial status, it sweeps in more individuals, "bring[ing] in all children" and other adults living under the same roof, "regardless of custody arrangements and the head of household's 'partners' and 'live-in-aids.'" Defs.' Reply 9 (citing Expert Report of Andrew Beveridge ("Beveridge Report") ¶ 11

& Ex. A, ECF No. 141-28). Thus, by way of example, in a household consisting of a grandfather, an aunt, a great-grandmother, a mother and her minor child, a nephew from the father's side of the family, and the great-grandmother's live-in aid, Plaintiffs' disparate impact analysis would include all seven individuals as part of the family. The FHA's definition, in contrast, would count only two individuals: the mother and her biological child. But increasing the number of individuals in a family in the manner that Plaintiffs do has a problematic consequence: in comparison to the observed effect on "families" for a statistical analysis that applies the statutory definition as the relevant comparison group, Plaintiffs' definition risks "overstating the effect of any redevelopment on families" as compared to non-families residing in otherwise similar units. *Id.* For instance, under the above hypothetical, Plaintiffs' analysis would include seven individuals in the affected protected class, whereas the FHA's definition would include just two individuals. Because Plaintiffs do not explain why the observed effect, applying their definition, is not overstated or otherwise provide evidence that, applying the statutory definition, the planned reduction in larger-sized apartments would require the relocation of families in a way that creates a disparate impact, they never confront this problem directly.

Rather than provide such evidence, Plaintiffs rely on the contention that the alleged harm to the "immediate family" (a term that the Court takes to refer to the narrower, FHA definition of a family unit) from breaking up the intergenerational family is actionable under the FHA.[15] Pls.'

---

[15] As mentioned previously, Plaintiffs' argument here relies on expert testimony from two individuals, Dr. Lance Freeman and Dr. Andrew Beveridge, *see* Pls.' Opp'n 21–22. Defendants have moved to exclude the testimony of both of these experts. *See* Defs.' Mot. to Exclude Lance Freeman's Expert Test., ECF No. 148; Defs.' Mot. to Exclude Andrew Beveridge's Expert Test., ECF No. 146. For purposes of this analysis, the Court assumes *arguendo* that this expert testimony is admissible. Because the Court ultimately concludes that Plaintiffs' evidence does not satisfy their burden at the first step of the disparate impact analysis, this assumption does not prejudice Defendants. And in any event, by discussing Dr. Beveridge's

Opp'n 21.  This argument seems to rest on a causal chain wherein (1) because breaking up multigenerational families will affect some of the individuals in those families who happen to have "familial status," (2) a showing of disparate impact on all of the members of the multigenerational family suffices to sustain Plaintiffs' claim.

However, Plaintiffs' argument falters because it conflates two analytically distinct points: the aggrieved class that has standing to sue and the protected class that is in fact covered by the statute.  Although this Court did look to the broader definition in determining Plaintiffs' standing to sue under the FHA, *Borum II*, 324 F.R.D. at 13 (noting the broad meaning of "aggrieved person" in the familial status context), Defendants are correct in emphasizing that, at the merits stage, the Court must consider the disparate impact on the "protected class," Defs.' Reply 9 (citing *2922 Sherman Ave. Tenants' Ass'n*, 444 F.3d at 681).  At this summary judgment stage, Plaintiffs' case falls on their failure to provide statistical evidence of a disparate impact from the proposed redevelopment on only the members of the protected class, as the Court just discussed. *See* Beveridge Report ¶ 32 (analyzing effect of proposed redevelopment on broader category first on "all household members" and then on "immediate family and aides only").  And without such evidence, the Court cannot say that Plaintiffs have carried their threshold burden based on submission of statistical evidence.[16]

---

analysis in their own filings, *see, e.g.*, Defs.' Reply 9, Defendants open the door to consideration of this expert report for the purpose of resolving the instant motion for summary judgment.

[16] The Court notes that Plaintiffs' argument that they have "demonstrated disparate impact through statistical evidence" focuses primarily on the proper unit-size standard (*i.e.*, occupancy standard) to use in the disparate impact analysis.  *See* Pls.' Opp'n 22–25.  This emphasis on how many rooms a given family requires elides the question of how to define the family unit in the first instance.  Only after settling this threshold point concerning the proper unit of analysis is it possible to assess the disparate impact of applying any given occupancy standard to that familial unit.  Because the Court concludes that this antecedent point provides sufficient grounds on which to resolve the pending motion, it expresses no opinion concerning the proper occupancy standard.

Nor do Plaintiffs develop any legal argument explaining why the Court should apply a different read of the FHA in assessing the statistical evidence that they present. Plaintiffs offer only the conclusory assertion that "[a] family consisting of a parent, a child, and a grandparent still qualifies as a 'family' under [the FHA's] definition." Pls.' Opp'n 21. This gloss on the statute, however, strikes the Court as particularly unconvincing in light of the FHA's status as a repository of negative rights that protects an enumerated category from discrimination based on membership in that enumerated, protected category. *See Inclusive Communities*, 135 S. Ct. at 2522 ("The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects[.]"). If Congress intended to apply the familial protected class category to "a parent, a child, and a grandparent," then it strikes the Court as unlikely that it would adopt an express definition of "familial status" that is so at odds with this broader understanding. Thus, although Plaintiffs have standing to pursue claims on behalf of those within the protected class, *see Borum II*, 324 F.R.D. at 13 (citing *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n.9 (1979)), they have not (1) established that Defendants' proposed policy would in fact disparately impact the relevant protected class or (2) otherwise justified the use of a different comparison group as the relevant protected class. Accordingly, Plaintiffs have not satisfied their burden at step one of the disparate impact analysis, and the Court grants summary judgment on this claim as a matter of law. *See Celotex*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 250).

## B. Discriminatory Statements Claim

Although Plaintiffs' disparate impact claims have been front and center for much of this litigation, the Court also faces the question of whether to enter summary judgment on Plaintiffs'

discriminatory statements claims.[17]  Before reaching the merits of Plaintiffs' discriminatory

statements charge, the Court must confirm ONE DC's standing, which Defendants continue to

contest.[18]  *See* Defs.' Mot. 47–54.

### 1. ONE DC's Standing

Defendants have challenged ONE DC's standing from the very start of this litigation.

Previously, in *Borum I*, the Court rejected Defendants' argument that "ONE DC lacks a

sufficiently concrete injury-in-fact" to establish standing.  218 F. Supp. 3d at 19 (quoting Defs.'

Mem. in Supp. of Mot. to Dismiss 31–35, ECF 16-1).  Pointing to ONE DC's factual allegations

concerning investment of staff time and diversion of resources for "crisis organizing" and

---

[17] Plaintiffs' motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) asks the Court to dismiss not only the claims that Ms. Borum brings in her individual capacity, but also Ms. Moore's discriminatory statement claims.  Pls.' Mot. Volun. Dismissal 1. Defendants urge summary judgment on both Plaintiffs' discriminatory statement claims, Defs.' Mot. 45, and, in the alternative, agree with Plaintiffs that dismissal is proper so long as the Court does not grant Plaintiffs' request concerning the entry of fees and costs, *see* Defs.' Mem. Part. Opp'n 4 ("This Court should . . . partially grant Plaintiffs' motion to dismiss Ms. Borum's claims and [the discriminatory statement claims] with prejudice, but deny [Plaintiffs'] motion to the limited extent that it seeks entry of a dismissal order stating that the parties are to bear their own costs and fees").  The Court will consider fees and costs concerning these Plaintiffs at a future point, should any motion on this matter be filed, and presently addresses only the question of whether dismissal is proper.  As the Court concluded with respect to Ms. Borum's disparate impact claims, because Defendants are not prejudiced by the dismissal of the individual plaintiffs' discriminatory statements claims, dismissal is proper pursuant to Rule 41(a)(2).  *See* Fed. R. Civ. P. 41(a)(2); *Robinson*, 216 F.R.D. at 18; 9 Charles A. Wright, Arthur R. Miller, *Federal Practice and Procedure* § 2364 (3d ed. 2019).  With this dismissal, because the Court previously decertified the class's discriminatory statements claims, *see Borum IV*, 2019 WL 2437686, at *12, only ONE DC now brings this claim.

[18] Because "standing is not dispensed in gross[,] . . . a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n,* 554 U.S. 724, 734, 737 (2008) (citations omitted).  Where there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Id.* at 1651.  Thus, the Court considers here whether the sole Plaintiff pursuing this claim—ONE DC—has standing for this specific discriminatory statement cause of action, independent of Plaintiffs' uncontested standing to bring their disparate impact claim as a class.

Brookland Manor-specific programming, *id.* at 20, the Court concluded that ONE DC had organizational standing because the complaint sufficiently indicated how "Defendants' alleged actions frustrated ONE DC's mission and ONE DC used resources to counteract that harm." *Id.* (citing *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Because this Court found that ONE DC had organizational standing, it did not address ONE DC's associational standing argument. *Id.* at 19. For the forthcoming reasons, the Court reaches a different conclusion at this post-discovery stage and concludes that ONE DC has not established either organizational standing either for itself or associational standing on behalf of its members; accordingly, it grants Defendants' motion for summary judgment on this claim.[19]

### a. Organizational Standing

"The Supreme Court has held that standing to bring a FHA claim is coextensive with constitutional standing." *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 52 (D.D.C. 2002); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). As this Court explained in *Borum I*, "[s]tanding based on an organization's own injury— 'organizational standing'—requires an organization, 'like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" 218 F. Supp. 3d at 19 (quoting *Equal Rights Ctr.*, 633 F.3d at 1138 (internal quotations omitted). The alleged injury in fact must be concrete, as opposed to "a mere setback to [the organization's] abstract social interests." *Equal Rights Ctr.*,

---

[19] Defendants also urge the Court to issue an adverse inference due to ONE DC's spoliation of evidence, Defs.' Mot. 52, which the Court previously addressed in *Borum V*, 332 F.R.D. at 49–50. For the reasons set forth below, such an inference is unnecessary for Defendants to prevail. The Court will address whether fees and costs associated with this issue are appropriate, as Defendants contend, *see* Defs.' Mot. for Reasonable Att'y Fees & Costs, ECF No. 151, in a separate, forthcoming opinion.

633 F.3d at 1138 (internal citations and quotations omitted).  Although "[a]n organization's expenditure of resources on a lawsuit does not constitute an injury in fact sufficient to establish standing," the organization can show an injury in fact "if the defendant's allegedly wrongful action prompts an organization to 'increase[ ] the resources [it] must devote to programs independent of its suit.'"  *Id.* (alterations in original) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  That said, "if an injury is 'self-inflicted as a result of the organization's own budgetary choices,' the party cannot claim an injury-in-fact as a result of the defendant's behavior."  *Borum I*, 218 F. Supp. 3d at 19 (quoting *Equal Rights Ctr.*, 633 F.3d at 1139 (internal quotations omitted)).  To assess whether an injury is self-inflicted and thus insufficient to claim injury in fact, the court must determine whether the party "undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation."  *Equal Rights Ctr.*, 633 F.3d at 1140.  Thus, "[i]n the housing context, using resources for a program to counteract a defendant's discriminatory advertisement constitutes an adequate injury-in-fact, because it is used for the practical purpose of responding to allegedly illegal activity, not to prepare for litigation."  *Borum I*, 218 F. Supp. 3d at 20 (citing *Equal Rights Ctr.*, 633 F.3d at 1140); *see also Spann*, 899 F.2d at 27–29.  Applying these principles in *Borum I*, this Court found that ONE DC had organizational standing to maintain its cause of action.  218 F. Supp. 3d at 20.  The Court did not address the question to which this Court next turns: ONE DC's standing to bring its discriminatory statements claim, specifically.

Here, Defendants make two primary points in support of their argument that ONE DC lacks organizational standing to pursue this claim.[20]  First, Defendants allege that ONE DC did not come to Brookland Manor with a public-minded purpose, but rather "sought to use Brookland Manor as a revenue source, both by charging fees to the tenants" for conversion of the private developments into tenant cooperatives and "by using its work there as a fund-raising opportunity."  Defs.' Mot. 49; *see also id.* at 50–51 (discussing how ONE DC has referenced Brookland Manor work to raise funds).  Second, Defendants contend that ONE DC did not need to divert resources from other projects to support its work at Brookland Manor, *id.* at 51–52, but rather "*chose* to get involved in Brookland Manor" and made the "budgetary choice . . . to allocate earmarked resources to pre-planned activities" at the complex, Defs.' Reply 22–23 (emphasis in original).

A bit of background is in order to situate the arguments and evidence that Plaintiffs present in an attempt to rebut Defendants' arguments.  Although the parties characterize exactly how ONE DC became involved in the Brookland Manor neighborhood differently, they seem to agree that the organization was invited to the site by a third party to consult with and educate Brookland Manor tenants.  Pls.' Response to Defs.' SUMF 30.  Defendants allege that "somebody c[a]me to ONE DC to get ONE DC involved in the Brookland Manor development" by "fighting the redevelopment" through tenant organization and "education" concerning the Tenant Opportunity to Purchase Act (TOPA).  Defs.' SMF 58 (alteration in original) (quoting

---

[20] The Court notes that both parties unhelpfully tend to discuss organizational standing without much specificity as to whether the asserted arguments and supporting factual allegations speak to Plaintiffs' disparate impact claim, discriminatory statements claim, or both claims.  In parsing the parties' filings, the Court endeavors, to the extent possible, to pinpoint the arguments that are specific to this claim.  *See Town of Chester, N.Y.*, 137 S. Ct. at 1650  (quoting *Davis,* 554 U.S. at 734, 737 (emphasizing that a plaintiff must establish standing with respect to each claim for relief).

Dep. of ONE DC 30(b)(6) Corp. Designee Dominic Moulden ("Moulden Dep.") 61:09–12, ECF

No. 143-3). Plaintiffs dispute the statement that they were fighting the redevelopment at the

start; rather, the BM/BV RA "and its attorney sought ONE DC's assistance doing education

around tenant ownership" because the proposed redevelopment might "trigger the issuance of . . .

[TOPA] notices." Pls.' Response to Defs.' SUMF 30 (citing Moulden Dep. 61:19–24; Decl. of

Dominic Moulden ¶¶ 12–13, ECF No. 165-57; Dep. of Rosemary Ndubuizu 19:17-20:4, ECF

No. 165-18); *see also* Pls.' Opp'n 45–46 (describing ONE DC's initial involvement at Brookland

Manor in 2014 at the request of the BM/BW RA and its attorney). On ONE DC's account, then,

the discriminatory statements at issue here created a "concrete injury . . . because they were at

loggerheads with ONE DC's mission-driven work." Pls.' Opp'n 43. To respond to the

statements, ONE DC needed "to divert resources away from educating the BM/BV RA about

communal forms of ownership to increasing efforts to strengthen the BM/BV RA to respond to

the redevelopment, organizing legal clinics, and conducting crisis counseling of resident families

concerned about their possible and imminent displacement." *Id*. at 44.

A close read of the Circuit's disposition in *Spann*, 899 F.2d at 27–31, reveals why

Plaintiffs' claim falters on injury in fact grounds. The *Spann* court addressed the same FHA

provision[21] that is at issue here—42 U.S.C. § 3604(c)—and found that the plaintiffs (a black

---

[21] The Court mentions only the FHA here and throughout the following analysis because "District of Columbia courts interpreting the DCHRA 'have generally looked [for guidance] to cases from the federal courts' arising under federal civil rights statutes,'" *Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591 (D.C. Cir. 1997) (quoting *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C. 1994)). And as Defendants point out and Plaintiffs at no point contest, "Courts interpreting the discriminatory statement provisions of the D.C. Human Rights Act have interpreted them in the same way as" the parallel FHA provision. Defs.' Mot. 46 n.17 (citing *Adus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 1617 (D.D.C. 2016); *Equal Rights Ctr. v. SCF Mgmt., LLC*, No 2014 CA004800 B, 2016 WL 8604491, at *3 (D.C. Super. Ct. Aug. 3, 2016)). Thus, the Court addresses these discrete statutory causes of action together.

resident of the District of Columbia and two non-profit corporations focused on equal housing opportunity) had established injury in fact sufficient to survive a motion to dismiss their discriminatory advertising claim.[22] *Id.* In *Spann*, the organizational plaintiffs submitted detailed affidavits to the district court that established how the advertising at issue "impacts adversely on the organizations' real estate testing program by acting as a steering method which discourages black home buyers and renters before they ever reach a particular complex, necessitating the [organizations] to broaden the scope of [their] efforts in order to reach all forms of discriminatory housing practices." *Id.* at 28 (quotation marks and internal citations omitted). Based on these factual allegations, the *Spann* court found that the alleged "drain[s] on the organization[s'] resources" were "no less palpable or specific than the injuries asserted by the organizational plaintiff in [*Havens Realty Corp. v. Coleman*, 102 S. Ct. 1114 (1982)]." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Havens*, 455 U.S. at 363) (citing *Saunders v. General Services Corp.*, 659 F. Supp. 1042, 1052 (E.D. Va. 1987); *Pacific Legal Foundation v. Goyan*, 664 F.2d 1221 (4th Cir. 1981)). The plaintiffs thus claimed more than mere "psychic[] injur[y] by witnessing noncompliance with the [FHA]." *Id.* at 29 (citations omitted). Because the plaintiffs not only "adequately asserted depletion of resources," but also established that this injury was "fairly traceable to the alleged racially-preferential advertising and likely to be redressed by court-ordered declaratory relief," the plaintiff organizations had

---

Any reference only to the FHA should be taken to reference by implication the parallel DCHRA provision, unless otherwise stated.

[22] Because § 3604(c) makes unlawful any "notice, statement, or advertisement" that falls within its provisions, and because the parties at no point argue that here is a distinction between these forms of communication, the Court proceeds here on the assumption that there is no meaningful difference between discriminatory statement claims like the ones that Plaintiffs press and a discriminatory advertising claim like the one in *Spann*.

organizational standing to pursue their claim.  *Id.*  However, the *Spann* court also cautioned that

success at trial on this claim would require the plaintiffs to provide further (1) "proof that

defendants violated the Act, *i.e.,* that to a 'reasonable reader the natural interpretation of

defendants' [statements] . . is that they indicate a preference'" on the basis of the protected

category "or an intention to make such a preference" and (2) proof "that this violation actually

caused them to expend resources or to suffer some other concrete injury."  *Id.* at 29–30 (quoting

*Saunders,* 659 F. Supp. at 1058) (citing *Ragin v. Steiner, Clateman and Assocs.,* 714 F. Supp.

709, 713 (S.D.N.Y. 1989)).

Applying these principles to this case, ONE DC's submissions fall short.  To be sure,

ONE DC does not need to provide evidence at the summary judgment stage that would be bullet-

proof at trial.  But ONE DC does need to point to specific facts in the record that reveal a

genuine issue that is suitable for trial, *see Celotex*, 477 U.S. at 324, and "on which the jury could

reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.  And at the summary judgment

stage, "the [claimant] can no longer rest on [the pleading stage's] mere allegations, but must set

forth by affidavit or other evidence specific facts, which for purposes of the summary judgment

motion will be taken to be true."  *United States v. Seventeen Thousand Nine Hundred Dollars*

*($17,900.00) in United States Currency ($17,900.00 in U.S. Currency)*, 859 F.3d 1085, 1090

(D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 561); *see also*

Fed. R. Civ. P. 56(e).

Here, the fundamental problem for ONE DC is that it never points to specific evidence

that establishes how the alleged discriminatory statements "actually caused them to expend

resources or to suffer some other concrete injury."  *Spann*, 899 F.2d at 30.  Plaintiffs attempt to

rebut Defendants by pointing to the deposition of Dominic Moulden, ONE DC's Rule 30(b)(6)

corporate designee, to establish that the organization first became involved because "ONE DC was asked to strengthen the BM/BV RA and respond to the redevelopment." Pls.' Opp'n 45 (citing Moulden Dep.). On Plaintiffs' account, this initial involvement was distinct from the later steps that ONE DC needed to take when it learned of the potential displacement of "dozens of long-time District residents, . . . thus putting the redevelopment plan in direct conflict with ONE DC's mission." *Id.*; *see also id. at* 50 (discussing ONE DC's initial reticence to litigate, until February 2016).

What is missing, though, is any evidence that connects up any of ONE DC's specific education, counseling, or advocacy efforts to Defendants' alleged discriminatory statements. Plaintiffs' complaint alleges only that it was "forced to reallocate significant financial resources and man power to community organizing and training efforts intended to empower Brookland Manor residents." Am. Compl. ¶¶ 170, 178. As the Court just noted, these bare allegations are insufficient at the summary judgment stage of litigation. *See $17,900.00 in U.S. Currency*, 859 F.3d at 1090. The closest that ONE DC comes to providing further detail concerning the specific discriminatory statements at issue is in the testimony of its 30(b)(6) deponent, Mr. Moulden. *See* Moulden Dep. Therein, Mr. Moulden states that Defendants' statements are discriminatory because characterizing larger units as inconsistent "with the creation of a vibrant, new community" is a "direct attack on family status, on family size and actually preserving the culture of the people that [ONE DC] work[s] with in D.C." *Id.* at 206.3–10. Mr. Moulden also testifies that the injury "comes from the idea of the statement which is that 'new' and 'vibrant' does not include the people that live [at Brookland Manor now] and the other people that we work with." *Id.* at 207.6–9. In order to contend with the effects of these statements, ONE DC states that it had to "conduct[] crisis counseling of resident families concerned about their

possible and imminent displacements" and to "increase[] efforts to strengthen the RA so it could more effectively respond to the redevelopment." Pls.' Response to Defs.' SUMF 74.

But none of these conclusory assertions, standing alone, provides evidentiary support concerning the specific outlay of resources to contend with discriminatory statements. Indeed, Defendants press this very point in moving for summary judgment. *Id.* ("Plaintiffs provide no citation to support this statement."); *see also* Defs.' Mot. 45 (arguing that ONE DC has not identified any harm to the organization as a result of the discriminatory statements); *cf.* Defs.' Reply 24 (contending that ONE DC lacks organizational standing, in general, because it "presents no evidence that it spent money dealing with" discrimination against families through the elimination of four- and five-bedroom units). Plaintiffs' omission is fatal to their claim: without pointing to specific facts in the record that reveal a genuine issue that is suitable for trial, *see Celotex*, 477 U.S. at 324, this Court cannot say that ONE DC has made a sufficient showing to survive Defendants' motion for summary judgment.

Moreover, even without focusing on a lack of evidence (though that is indeed what the law requires), at a more general level, there is a missing link between the specific investments alleged here and the discriminatory statements. Beyond the fact that the "statements . . . were at loggerheads with ONE DC's mission-driven work," how, exactly, did these statements themselves "force[] ONE DC to redirect its resources to counteract the[ir] impact"? Pls.' Opp'n 43–44. Plaintiffs never say anything more to substantiate this bare allegation, instead directing the Court to their general argument concerning ONE DC's organizational standing. *Id.* at 44. Without more, and especially without any declarations or other testimony from ONE DC members or other Brookland Manor residents concerning the impact of the statements on them, the Court can only speculate about the relationship between the discriminatory statements and

ONE DC's diversion of resources to "educat[e] the BM/BV RA about communal forms of ownership," its "efforts to strengthen the BM/BV RA to respond," or its "organiz[ation] of legal clinics" and "crisis counseling of resident families concerned about their possible and imminent displacement." *Id*. This is not enough to survive summary judgment.

A comparison to *Spann* again underscores what is missing here. In the context of racially discriminatory advertisements, the *Spann* court suggested that the plaintiff organizations might show injury by, for instance, "prov[ing] that the [allegedly discriminatory] advertisements discouraged potential minority home buyers from attempting to buy homes at defendants' developments and forced the organizations to spend funds informing minority home buyers that the homes are in fact available to them." *Spann*, 899 F.2d at 30. Only with this sort of further showing could the plaintiffs establish, at a later stage of trial, that they were entitled to go further with their discriminatory statements claim. *Id*. at 29. Here, Plaintiffs have not made the requisite further showing because they have not provided any evidence to connect the dots between the allegedly discriminatory statements, the impact on any residents of the community, and the subsequent alleged outlay of resources. Nor, as the Court just discussed, have they submitted any other specific evidence at all concerning this claim. Thus, ONE DC has not carried its burden to provide evidence that would permit a reasonable juror to conclude that the alleged violation—the three discriminatory statements—"actually caused them to expend resources or to suffer some other concrete injury." *Spann*, 899 F.2d at 30 (citations omitted). Accordingly, Plaintiffs have failed to establish organizational standing to bring ONE DC's discriminatory statements claim.

*b. Associational Standing*

ONE DC's associational standing argument fares no better. "For an organization to sue on behalf of its members through 'associational standing,' it must show that (1) 'its members would otherwise have standing to sue in their own right,' (2) 'the interests it seeks to protect are germane to the organization's purpose,' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Borum I*, 218 F. Supp. 3d at 19 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996)); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But ONE DC makes none of these showings for a very straightforward reason: ONE DC never speaks to associational standing with respect to the discriminatory statements claim at all. In fact, all of ONE DC's arguments concerning associational standing center on allegations that the redevelopment "would harm [ONE DC members] by way of displacement and an inability to find other suitable housing if forced to leave their communities," Pls' Opp'n 53, creating a "discriminatory impact" on "low-income resident families," *id.* at 54, including ONE DC members. In short, ONE DC at no point so much as mentions the discriminatory statements at issue in the context of developing its associational standing argument. Without more, though, to indicate how ONE DC is endeavoring to proceed on behalf of particular identified members for this claim, the Court is left guessing on central matters such as whether ONE DC's members would have standing in their own right or whether their participation is required to pursue the relief requested.

With respect to the requested relief, moreover, Defendants maintain that ONE DC's associational standing argument fails, without distinguishing between the discriminatory impact and discriminatory statements claims, because "the lawsuit seeks compensatory damages that

cannot be awarded without the participation of [ONE DC's] members." Defs.' Mot. 54. More specifically, because the complaint itself seeks damages to the extent authorized by the FHA and DCHRA, *see* Am. Compl. 35, and because ONE DC at no point addresses why the involvement of individual members is not required to pursue this claim for damages, Defendants press that the organization's associational standing theory must fail. Defs.' Mot. 54 (citing *Telecomms. Research & Action Ctr. on Behalf of Checknoff v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) ("[F]ederal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members.")).

Although the Court agrees with Defendants that ONE DC at no point discusses damages, for the reasons previously articulated, the Court declines to enter judgment concerning ONE DC's overall associational standing for all of its claims. Turning to the specific discriminatory statements claim at issue, the Court disagrees that the failure to address damages is dispositive in the manner that Defendants appear to assert. Defendants' argument risks conflating an element of the claim with the form of relief available to a meritorious plaintiff in a discriminatory statements claim. It is true that "[t]he successful plaintiff in an action under 42 U.S.C.A. § 3604(c) may be granted various types of relief," including, *inter alia*, an award of compensatory damages to "[a]n equal housing opportunity organization . . . for the impairment of its objectives and diversion of its resources caused by the defendant's discriminatory advertisements." William H. Danne, Jr., *Validity, Construction, and Application of § 804(c) of Civil Rights Act of 1968 (Fair Housing Act) (42 U.S.C.A. § 3604(c)) Prohibiting Discriminatory Notice, Statement, or Advertisement With Respect to Sale or Rental of Dwelling*, 142 A.L.R. Fed. 1 (1998) (citing *Saunders*, 659 F. Supp. 1042); *see Spann*, 899 F.2d at 26 (addressing standing of organizational

plaintiffs who pursued both compensatory and injunctive relief pursuant to FHA § 3604(c)).  But the availability of such forms of relief does not mean that compensatory damages are a necessary element of the claim.  *See Mayers v. Ridley*, 465 F.2d 630 (D.C. Cir. 1972) (addressing suit for declaratory and injunctive relief pursuant to FHA § 3604(c)).

Here, ONE DC's briefs asserting associational standing state only that the organization "seeks injunctive relief for . . . discriminatory statements claims on behalf of its members and their minor children who reside in units targeted for elimination."  Pls.' Opp'n 54.  The organization indeed says nothing at all about damages, just as Defendants note.  Instead, ONE DC contends that it can stand in for its members with respect to the claim for injunctive relief because its "claims are co-extensive with the claims of class members and accordingly rely on common issues, including 'whether th[e] redevelopment will have a disparate impact based on familial status.'"  *Id*. (quoting *Borum II*, 324 F.R.D. 1 at 16).  Yet, as this assertion itself indicates, ONE DC never says anything to (1) establish how its interests are co-extensive with its *organizational members* (as opposed to a now-decertified class) or (2) indicate why the participation of its members is not necessary for the relief requested with respect to this specific claim.  Accordingly, ONE DC again fails to sustain its claim of associational standing with any specificity, and cannot carry its burden to establish standing.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" standing).

Thus, the Court finds that ONE DC has not established standing to pursue its discriminatory statements claim and grants summary judgment on this claim as a matter of law.[23]

### C. Motions to File Under Seal

One final procedural matter remains: both parties have moved to file a number of documents under seal, citing privacy interests in confidential information.[24] *See* Defs.' Unopposed Mot. Leave to File Docs. Under Seal, ECF No. 143; Defs.' Mot. Leave to File Ex. Relating to Mot. to Exclude Expert Test. of Andrew Beveridge Under Seal, ECF No. 147; Defs.' Mot. Leave to File Exs. Relating to Mot. to Exclude Expert Test. of Jonathan Stern Under Seal, ECF No. 150; Pls.' Mot. Leave to File Under Seal Pls.' Mem. Opp'n Defs.' Mot. Summ J. & Materials in Supp. Thereof, ECF No. 165; Pls.' Mot. Leave to File Under Seal Pls.' Mem. Opp'n Defs.' Mot. to Exclude Expert Test. of Andrew Beveridge & Exs. in Supp. Thereof, ECF No. 166; Pls.' Mot. Leave to File Under Seal Pls.' Errata & Corrected Mem. P. & A. in Opp'n to Defs.' Mot. Summ. J., ECF No. 170;  Defs.' Mot. Leave to File Documents Under Seal, ECF No. 175.

All motions for leave to file under seal are unopposed.  All of the underlying documents include information that the parties designated as confidential pursuant to the Court's December

---

[23] Because it reaches this conclusion, the Court need not address, and reaches no conclusion regarding, the parties' arguments concerning the merits of the discriminatory statements claim, including whether or not the statements fall within the scope of the relevant statutory provisions or how an "ordinary reader" would construe them.

[24] Plaintiffs have also submitted an unopposed motion for leave to file under seal certain other materials associated with the parties' respective motions for attorneys' fees and costs. *See* Pls.' Mot. Leave to File Under Seal Ex. in Supp. of Plaintiffs' Mot. for Attys.' Fees and Costs, ECF No. 154, Pls.' Mot. Leave to File Under Seal Exs. 1 and 2 in Supp. of Pl. ONE DC's Opp'n Defs.' Mot. Attys.' Fees and Costs, ECF No. 156.  The Court will address these pending motions in a forthcoming opinion, along with its resolution of the parties' motions for fees and costs. *See* Defs.' Mot. Reasonable Attys.' Fees & Costs, ECF No. 151; Pls.' Mot. Reasonable Attys.' Fees & Costs, ECF No. 153.

15, 2016, Protective Order, ECF No. 36, and all involve significant privacy interests that outweigh the need for public access. *See Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016). Accordingly, the Court grants the above-referenced motions for leave to file under seal.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**; Plaintiffs' motion for voluntary dismissal is **GRANTED IN PART**; Plaintiffs' motions for leave to file under seal are **GRANTED**; Defendants' motions for leave to file under seal are **GRANTED**; Defendants' motions to exclude expert testimony are **DENIED** as moot; and Defendants' motion for extension of time is **DENIED** as moot.[25] An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 30, 2020                                                     RUDOLPH CONTRERAS
                                                                          United States District Judge

---

[25] Although Defendant requests a hearing and oral argument concerning several of its pending motions, the allowance of oral hearings is "within the discretion of the Court." LCvR 7(f). Because the parties' written briefings are sufficient to resolve the instant motions, the Court declines to conduct oral hearings.